IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RHOADS INDUSTRIES, INC., et al | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 15-921 |
| | : | |
| SHORELINE FOUNDATION, INC., et al | : | |

| | | |
|---|---|---|
| RHOADS INDUSTRIES, INC., et al | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 17-266 |
| | : | |
| TRITON MARINE CONSTRUCTION | : | |
| CORP. | : | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                  September 2, 2022

   Presently before the Court are Defendants' Triton Marine Construction Corp. ("Triton"),

Shoreline Foundation Inc. ("Shoreline"), and TranSystems Corp. ("TranSystems") (collectively

"Defendants") Joint Motions *in Limine*. (Dkt. 17-266, Docs. 209, 210, 211, 212); (Dkt. 15-921,

Docs. 187, 188, 198, 190, 191, 192.) Plaintiffs Rhoads Industries, Inc. and Rhoads Marine

Industries, Inc. (collectively "Rhoads" or "Plaintiff") filed Responses in Opposition to Defendants'

Motions (Dkt. 17-266, Docs. 213, 214, 215); (Dkt. 15-921, Docs. 202, 203, 204, 205, 206, 207),

to which Defendants filed respective Replies. (Dkt. 17-266, Docs. 219, 217, 218); (Dkt. 15-921,

Docs. 228, 229, 216, 217, 218, 219.) Plaintiff also filed Motions *in Limine*, (Dkt. 15-921, Docs.

193, 194, 195, 196, 197, 198, 199, 200), to which Defendants filed Responses in Opposition, (Dkt.

15-921, Docs. 215, 211, 209, 212, 213, 210), and Plaintiff filed respective Replies. (Dkt. 15-921,

Docs. 221, 222, 223, 224, 225, 226.)

1

I.    **BACKGROUND**

As the parties are familiar with the relevant facts and circumstances underlying these motions, we provide here only a brief statement of background information. Rhoads commenced these actions against Triton, Shoreline, and TranSystems following upon their completion of repair and renovation work for the United States Navy ("Navy") at the Philadelphia Naval Shipyard. Rhoads alleges claims of negligence related to Defendants' construction activity, principally asserting that Defendants' pile driving caused subsidence at Rhoads's neighboring property, which impaired the condition of its dry dock ("Dry Dock 2"), among other structures.

The parties have completed discovery and a trial date has been set for January 18, 2023. (Dkt. 15-921, Doc. 231.) On July 2, 2021, we issued a decision resolving the parties' respective *Daubert* challenges to the admissibility of expert opinions. (Dkt. 15-921, Doc. 150.) On March 1, 2022, and March 10, 2022, we issued decisions resolving the parties' motions for summary judgment. (Dkt. 15-921, Docs. 180, 182.) The parties now move to exclude or otherwise limit certain evidence from the jury's consideration at trial. In this omnibus opinion, we address separately the questions raised in the parties' seventeen total motions *in limine*. For the following reasons, Defendants' motions are denied, and Plaintiff's motions are granted, subject to the exceptions and conditions articulated below.

II.    **LEGAL STANDARD**

Federal courts are guided by the Federal Rules of Evidence in determining the admissibility of evidence at trial. *See* Fed. R. Evid. 101, 102. We note that "[t]he admission or exclusion of evidence is a matter particularly suited to the broad discretion of the trial judge." *In re Merritt Logan, Inc.,* 901 F.2d 349, 359 (3d Cir. 1990); *see also Sprint v. Mendelsohn*, 552 U.S. 379, 384 (2008) ("A district court is accorded a wide discretion in determining the admissibility of evidence

under the Federal Rules."). In the event that any of these motions raise substantive legal questions for our consideration, we will apply Pennsylvania law.

Several of the parties' motions *in limine* involve arguments about the relevancy or the prejudicial effect of certain evidence. As a general matter, Federal Rules of Evidence 401 and 402 govern the admissibility of "relevant" evidence. Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). Federal Rule of Evidence 403 allows the court to exclude relevant evidence when the "probative value" of that evidence is "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. To the extent that the parties raise additional, more tailored, arguments as to the admissibility of evidence in accordance with other Federal Rules of Evidence, we address those specific arguments below.

## III.    DISCUSSION

We first discuss Defendants' motions, which broadly seek the exclusion of evidence related to pile driving and vibration monitoring standards, Plaintiff's standing to sue, and Plaintiff's claimed damages. We then examine Plaintiff's motions, which generally seek the exclusion of evidence related to the Navy's involvement in this litigation and past insurance or settlement recovery. Plaintiff also requests we take judicial notice of certain government documents.

### A.  Defendants' Motions *in Limine*

Defendants have submitted nine motions *in limine* for our consideration, seeking to preclude the following evidence: (1) "Use of the Number of Refusal/Hard Hits Relative to the Hammer Manufacturers' Warranties" (Dkt. 17-266, Doc. 209); (2) "Testimony Regarding

Whether Defendants Should Have Performed Additional Vibration Area Studies" (Dkt. 17-266, Doc. 211); (3) "Certain Financial Damages Testimony Regarding Categories of Damages Attributable to Each Sinkhole" (Dkt. 17-266, Doc. 212); (4) "Claim for Damages Related to Replacement and/or Repair of Pumps and Other Equipment" (Dkt. 15-921, Doc. 187); (5) "Lay Testimony Regarding Dry Dock Qualifications for Certifications and the Impact of Sinkholes on the Certification Process" (Dkt. 15-921, Doc. 188); (6) "Additional Evidence Related to the Alleged Assignment Between Plaintiffs and PAID" (Dkt. 15-921, Doc. 189); (7) "Plaintiff's Damages Due to Plaintiff's Failure to Mitigate Damages" (Dkt. 15-921, Doc. 190); (8) "Plaintiff's Damages to the Lesser of Cost of Repair and the Diminution to the Fair Market Value of the Property" (Dkt. 15-921, Doc. 191); and (9) "Plaintiff's Damages as to Alleged Loss of Navy Projects." (Dkt. 15-921, Doc. 192.) After reviewing Defendants' arguments, all nine of its motions are denied, notwithstanding any exceptions or conditions articulated below.

### i.   Preclude Testimony Regarding the Use of the Number of Refusal/Hard Hits Relative to the Hammer Manufacturers' Warranties (Dkt. 17-266, Docs. 209, 210, 213, 219)[1]

Defendants argue that we should exclude the testimony of Plaintiff's liability engineering expert, Edward Garbin ("Garbin"), as they claim he improperly utilized the hammer manufacturers' warranty standard in his professional assessment of Defendants' pile driving activity. (Doc. 210-1 at 5.) Defendants assert that this evidence is not admissible at trial, as the hammers' manufacturer's warranty standard is apparently "not an accepted standard by any controlling organization or the U.S. Navy as to what the contractors were to comply with while

---

[1] Defendants requested via praecipe that the Clerk's Office substitute Doc. 210 for Doc. 209 due to an error in its original submission. Accordingly, we refer to arguments made only Doc. 210, which contains Defendants' substituted version.

performing their scope of work." (*Id*. at 11.) Specifically, Defendants contend that Garbin conflates the manufacturers' warranty standard with a general industry safety standard, even though he acknowledged in his report that these standards can vary from project to project. (*Id*. at 9-11.) Accordingly, "any testimony by Garbin on this issue should be barred[,]" as his expert opinion is allegedly "not substantiated" by "a standard that does not exist" and therefore runs afoul of Federal Rule of Evidence 702.[2] (*Id*. at 13, 15.) Defendants also argue that, if we exclude Garbin's testimony, we must also exclude Plaintiff's damages claims entirely, as "[a]bsent such expert testimony, Rhoads cannot prevail at trial on these damages claims and preclusion of these claims is appropriate." (*Id*. at 15.)

Having reviewed Defendants' current arguments in conjunction with our previous decision as to the qualification, reliability, and "fit" of Garbin's testimony, we are satisfied that this evidence is admissible. At the outset, we agree with Rhoads's characterization of Defendants' motion as "a *Daubert* motion disguised as a motion *in limine*." (Doc. 213 at 1.) As Plaintiff has highlighted in its response briefing, we have already considered arguments by the parties as to the admissibility of Garbin's opinion and reviewed the sources upon which he relied in forming that opinion. We confirmed in our prior *Daubert* decision that Garbin will be permitted to testify at trial as to the "practical refusal criteria" he believes Defendants should have established, as well

---

[2] Federal Rule of Evidence 702 reads: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. This standard has also been articulated in, and applied in accordance with, *Daubert v. Merrell Dow Pharm*., 509 U.S. 579 (1993).

as the materials he utilized to arrive at his conclusions—including the hammer manufacturers'

warranties:

> In his report, Garbin discussed practical refusal at length and opined that Defendants should have established "practical refusal criteria" for their projects. Practical refusal criteria are standards that reflect the number of hammer blows required to drive a pile a given distance into the soil. Where a pile has been driven sufficiently deep into the soil such that it requires an excessive number of blows to move it a small distance deeper, practical refusal has been reached. The precise standard for defining radical refusal may vary for each individual project, but there are "several sources typically reference as industry standards." When practical refusal is reached, "pile driving should be stopped to avoid damage and safety issues."

> Here, Garbin opines that Defendants should have established and adhered to practical refusal criteria. He explained that the hammers that Defendants were using to drive piles came with manufacturer-specified practical refusal criteria, and that Defendants drove piles beyond the accepted safe point established by those criteria, resulting in what [Garbin] refers to as "hard driving.'"

> . . .

> We acknowledge Garbin's testimony that the practical refusal concept may focus upon equipment damage and worker safety, but that does not necessarily preclude its consideration here. […] At the outset, we accept Defendants' argument that practical refusal criteria are not relevant to a factual dispute in this case to the extent they are solely meant to protect workers and pile driving equipment. We further acknowledge Garbin's deposition testimony that practical refusal criteria have only two purposes: to protect workers, and to prevent damage to equipment. However, we also observe that in his report, Garbin opined that "pile driving over the practical refusal limit is considered excessive and damage to the equipment, the piles, *and/or the surroundings* may result." Therefore, to the extent that Garbin opines that exceeding practical refusal criteria poses a risk to areas surrounding the pile driving activity, that testimony has the potential to assist the trier of fact.

> Taken together, we conclude, in the exercise of our "broad discretion," that Garbin's testimony regarding practical refusal criteria is not precluded to the extent that he opines that exceeding such criteria poses a risk to the soil and surrounding areas. We find that this testimony could well assist the jury in understanding the

> evidence in this case and determining facts at issue. Accordingly,
> we decline to grant Defendants' motion as to Garbin's testimony.

(Dkt. 15-921, Doc. 150 at 21-23) (internal citations omitted) (alterations in original).

In conclusion, we have already determined that Garbin is a qualified expert under the standards set out by *Daubert*; we will not reconsider our previous determination as to the admissibility of Garbin's opinion under Rule 702, nor will we reexamine the bases upon which Garbin's opinion relies. Garbin will presumably be presented and cross-examined before the jury at trial, at which point the Defendants will have the opportunity to raise the challenges to Garbin's opinion they have articulated here. For the above-stated reasons, and with deference to our prior *Daubert* decision, Defendants' motion is denied as to this issue.

### ii. Preclude Testimony Regarding Whether Defendants Should Have Performed Additional Vibration Area Studies (Dkt. 17-266, Docs. 211, 214, 217)

Defendants next seek to exclude any "expert opinion that that Defendants should have recommended vibration monitoring or more expansive vibration monitoring to the Navy." (Doc. 211 at 12.) Specifically, Defendants point to the report offered by Plaintiff's causation expert, David Wilshaw ("Wilshaw"), as lacking "any scientific or empirical testimony or data to support the opinion that pile driving caused damage to the dry dock." (*Id*.) They assert that "Wilshaw cannot establish that pile driving conducted on adjacent Naval property resulted in readings that exceed the safe levels for the pile driving to structures, [and] it follows that Wilshaw is unable to opine that a certain type of vibration monitoring or any vibration monitoring *would have* recorded the requisite levels of concern." (*Id*. at 12-13) (emphasis in original). Defendants also claim that Wilshaw's testimony on this issue is inappropriate due to the fact that the parties were never required by contract, or otherwise expected, to perform such testing for the Navy. (*Id*. at 13-14.)

7

As Wilshaw apparently "offers unsubstantiated opinions, without any factual basis, that further vibration monitoring should have been recommended[,]" Defendants claim that his testimony would violate Rule 702. (*Id*. at 16-17.) Additionally, Defendants challenge the admissibility of Garbin's testimony on vibration monitoring, similarly claiming that Garbin's testimony is not admissible, as "Plaintiff is unable to cite a basis for [Garbin's] opinion." (Doc. 211 at 14.)

We cannot ascertain why Defendants filed a motion to preclude testimony by Wilshaw that we have already deemed precluded. Nor can we understand why they seek to preclude testimony by Garbin that we have already deemed admissible. Indeed, Defendants presented these exact same arguments for our review over a year ago, which we analyzed and subsequently resolved in our *Daubert* decision.[3] We reiterate our previous holding as to the admissibility of vibration monitoring testimony by both Wilshaw and Garbin:

> Wilshaw has not offered the opinion Defendants seek to preclude. Indeed, while Defendants assert that Wilshaw opined that they should have recommended vibration monitoring "in his reports," they provide no citation as to where in his reports he is supposed to have offered this opinion. Further, Rhoads clarifies in its response that only its other causation expert, "Dr. Garbin, not Mr. Wilshaw, opined about recommending vibration monitoring." Moreover, our review of Wilshaw's reports and deposition testimony further confirmed that no opinions as to whether Defendants should have recommended vibration monitoring are contained therein. To the contrary, to the extent that whether Defendants "should have" recommended vibration monitoring bears on the standard of care, Wilshaw expressly stated that he does not intend to offer any such opinion[.]
>
> • • •
>
> Accordingly, Defendants' motion is granted on the narrow point that Wilshaw is precluded from offering an opinion that Defendants

---

[3] It bears noting that, as Plaintiff pointed out in its response briefing, Defendants "literally copied and pasted nearly the entirety of their *Daubert* motion to preclude David Wilshaw into this Motion [*in limine*]." (Doc. 214 at 1.)

should have recommended vibration monitoring or expanded vibration monitoring by the Navy.

. . .

We find that Garbin's opinion as to whether Defendants should have recommended vibration monitoring is reliable. First, we have discussed at length above that Garbin has "good grounds" for his opinion that vibrations from the pile driving reached the dry dock. Therefore, Defendants' argument that Garbin should be precluded from testifying that vibration monitoring should have been performed must fail to the extent it is predicated solely on an alleged lack of evidence that vibrations would have reached the dry dock. Moreover, even setting aside the question of whether vibrations reached the dry dock, we find that Garbin has "good grounds" for his opinion that more expansive vibration monitoring should have been recommended. In support of this opinion, Garbin considered the Federal Highway Administration's "Design and Construction of Driven Pile Foundations" publication, which "warns that the distance [for continual vibration monitoring] should be increased to 500 feet for 'older structures, structures or utilities in poor condition, or highly vibration sensitive equipment.'" In light of this guidance, Garbin further considered the "age, condition and sensitivity of the structures and utilities near the work area," in concluding that "TranSystems, Shoreline, and Triton had an obligation to…complete…continual vibration monitoring." Garbin's opinion is thus based upon more than what Defendants characterize as his subjective beliefs or conjecture. We therefore conclude, in accordance with the liberal admissibility standards embodied in Fed.R.Evid. 702, that Garbin has "good grounds" for his opinion which could be seriously tested by the adversary process.

(Doc. 150 at 19-20, 28-30) (internal citations omitted) (alterations in original).

In sum, we already determined that Wilshaw is not permitted to offer affirmative testimony regarding vibration monitoring at trial, as he did not purport to offer any opinion on this issue in his expert report. In a footnote, we clarified that our determination "does not necessarily foreclose the possibility that Wilshaw could be permitted to offer rebuttal testimony on this subject in the event that Defendants' experts' testimony opens the door to it, pursuant to Fed.R.Evid. 703. (Doc. 150 at 30, n.4) (citing *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir.

2006)). Our decision on the admissibility of Wilshaw's testimony, including this caveat, has not changed. We also determined that Garbin's opinion on vibration monitoring is reliable and therefore admissible. Accordingly, to the extent Defendants seek to challenge Garbin's testimony on this issue, they may do so on cross-examination. For the above-stated reasons, and with respect to our previous decision determining the admissibility of expert testimony on vibration monitoring, Defendants' motion is denied.[4]

### iii.   Preclude Certain Financial Damages Testimony Regarding Categories of Damages Attributable to Each Sinkhole (Dkt. 17-266, Docs. 212, 215, 218)

Defendants also challenge the admissibility of testimony by Plaintiff's financial damages expert, Gregory Cowhey ("Cowhey"), "regarding specific categories of damages attributed to each sinkhole due to lack of foundational support" on the basis that "he is unqualified to give an opinion on causation." (Doc. 212 at 3.) Defendants assert that, "while [Cowhey] may offer financial opinions that at a certain time period, damages increase, or state [his calculations], or what the damages were, *he cannot offer opinions or any testimony as to categories of damages attributable to each sinkhole*." (*Id.* at 15) (emphasis added). Defendants appear to contest the allocation of damages that Cowhey assigned to each sinkhole in his expert report. In doing so, Defendants claim that Cowhey's expert opinion also impermissibly crosses into an unsubstantiated expert opinion

---

[4] In their reply brief, Defendants clarify that they "seek broader relief to preclude *any and all* testimony regarding whether [D]efendants should have performed additional vibration monitoring […] [t]his not only includes any testimony by Wilshaw, including rebuttal testimony, as well as by any other witness that may testify at the time of trial." (Doc. 217 at 1-2) (emphasis added). To the extent a lay witness, or an expert which we did not approve at the *Daubert* stage to testify on this issue, seeks to offer any statement beyond the scope of their knowledge or expertise, we will entertain an objection on this basis at trial.

on causation, which Defendants contend is outside the scope of Cowhey's financial expertise. (*Id.* at 13-15.)

      Once again, Defendants attempt to subvert the conclusions made in our prior *Daubert* decision by challenging the admissibility of expert testimony with a motion *in limine*. We emphasize our previous holding on the admissibility of Cowhey's testimony:

> First, it is clear that Cowhey does not purport to offer any opinions as to causation, despite Defendants assertions otherwise. To be sure, his damages report is predicated on the assumption that Rhoads will prevail on issues of liability, including causation. […] Operating under that assumption, however, is not tantamount to offering an opinion as to causation. In fact, "[a]ll damages expert opinions are dependent…on the assumption that liability has been proven."

> . . .

> Specifically, Defendants take issue with Cowhey's assumption that nearly all of the repair costs resulted from the second sinkhole, which occurred following Triton's pile driving activities, as opposed to from the first sinkhole, which appeared after TranSystems' and Shoreline's pile driving. They contend that his opinion as to these costs unreliably fails to account for damage that was present prior to any pile driving, and fails to separate damage that allegedly occurred from TranSystems' and Shoreline's pile driving, thereby pinning the entire cost on Triton.

> Here again, Defendants seem to have blurred the line between Cowhey's assumptions as to causation and his opinions as to damages. Indeed, Cowhey himself does not opine as to whether the first or second sinkhole caused specific damage to Rhoads' property. Rather, his opinion rests on "an assumed set of facts" (i.e., that the majority of the cost of repairs resulted from the second sinkhole), as is permissible, "so long as those assumed facts are reasonably based on the evidence in the record." Here, the facts upon which Cowhey's opinion relies are clearly based on evidence in the record. In fact, his calculations as to repair costs are directly based on Rhoads' actual, dated invoices for the repair activities, which are appended to his report, as well as his interviews with Rhoads management.

> . . .

> Given the foregoing, we conclude that Cowhey's opinion regarding the cost of repairs rests on a sufficient factual basis to support its admissibility and that any deficiencies can be explored on cross examination.

(Doc. 150 at 65, 71-72) (internal citations omitted).

After reviewing our previous decision, it appears we have already determined that Cowhey does not impermissibly offer causation evidence, nor does he improperly attribute certain damages to the sinkholes. Defendants concede that the admissibility of Cowhey's expert opinion was previously litigated: "While it is true that Cowhey was not precluded as an expert outright at [the *Daubert* stage], Defendants are entitled to seek relief in the form of a motion *in limine* to narrow the scope of his testimony." (Doc. 218 at 1.) We do not disagree that Defendants may seek to limit an approved expert's testimony, especially if portions of that testimony are likely to be irrelevant, misleading, or otherwise prejudicial. Defendants here, however, have simply failed to articulate how or why Cowhey's testimony should be narrowed. In fact, their suggested scope of "narrowing" seems to eviscerate Cowhey's expert opinion entirely, as they admittedly "seek to preclude *any and all* testimony by Cowhey regarding financial damages[.]" (*Id.* at 2) (emphasis added). We will not reconsider our previous decision as to Cowhey's admissibility as a financial damages expert. To the extent Defendants contest Cowhey's methods and opinions, they will be free to challenge him at trial on cross-examination. For the above stated reasons, and with regard to our prior *Daubert* decision on this issue, Defendants' motion is denied.

### iv.   Preclude a Claim for Damages Related to Replacement and/or Repair of Pumps and Other Equipment (Dkt. 15-921, Docs. 187, 202, 228)

In anticipation of a possible claim by Rhoads for damages related to the "replacement and/or repair of pumps and other equipment for Dry Dock 2," Defendants assert that no evidence has been produced in this case that would support such a claim, and so the claim must be precluded.

(Doc. 187 at 8.) Defendants acknowledge that Plaintiff's corporate designee, Robert Orbaugh ("Orbaugh"), testified about "an increased amount of mud, dirt, and debris in the area of Dry Dock 2, and the use of dumpsters and maintenance pumps to address these issues." (*Id*. at 6.) Specifically, Orbaugh asserted that the maintenance pump now runs "24/7" and that several dumpsters are used each year to remove debris from Dry Dock 2. (*Id*.) In spite of this evidence, Defendants claim that Orbaugh's lay witness testimony would be "insufficient to support a claim for damages […] because he has no specialized knowledge or technical personal knowledge regarding [causation]" under Federal Rules of Evidence 602 and 701.[5] (*Id*. at 7.) Defendants further contend that "[n]o expert report or testimony has been adduced […] that specifically attributes an increased amount of debris to Defendants' conduct in the area of the aged Dry Dock 2." (*Id*.) According to Defendants, the record is devoid of any affirmative expert testimony regarding damages related to the repair and replacement of maintenance pumps. (*Id*. at 7-8.) They contend that awarding damages on this basis would be improper, and the claim should be excluded. (*Id*.)

Contrary to Defendants' assertion, and as set out by Rhoads in its response briefing, there is sufficient expert testimony in the record to support a claim for damages related to the repair and replacement of the maintenance pumps. Specifically, causation expert Garbin opined in his report that, "existing cracks in the bottom slab [of Dry Dock 2] widened in response to vibrations from

---

[5] Federal Rule of Evidence 602 reads in relevant part: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. Federal Rule of Evidence 701 reads: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

pile driving, allowing more water and sediment to flow through." (Doc. 208-1, Pl. Ex. 1, Garbin Rep. at 2.) Further, damages expert Cowhey attributed a monetary value to the cost of mud removal and pump repair related to Dry Dock 2, as part of "extra expenses" arising out of the subsidence allegedly caused by the sinkholes.[6] (Doc. 208-2, Pl. Ex. 2, Cowhey Rep. at 14.) We agree with Rhoads that this record evidence "belies" Defendants' assertion that Plaintiff's claim for damages related to the maintenance pumps is unsupported by expert opinion. (Doc. 202 at 4.) We also remind Defendants that they challenged Cowhey's calculation of these "extra expenses" with a *Daubert* motion, and we rejected their arguments:

> Defendants assert that Cowhey's calculations resulted in figures that are "overstated, inappropriate and/or unsupported." They contend that this deficiency results from "a lack of objective data," for example, regarding "*the historical frequency and volume of mud removal.*" We find that this contention is without merit. As set out above, Cowhey relied on documentation including invoices from repair activities to determine expenses. To the extent that Defendants dispute that data underpinning his calculations, they have articulated a challenge to the weight of Cowhey's opinions, not their admissibility

(Doc. 150 at 72, n.13) (internal citations omitted) (emphasis added).

As to the admissibility of Orbaugh's lay testimony on this issue, we do not disagree that Orbaugh cannot opine on complex issues such as causation and damages calculations, which

---

[6] Specifically, Cowhey itemized the damages as follows:

1. <u>Mud Removal</u> – The sinkholes caused "expansion cracks" in the floor of Dry Dock 2 which allowed thousands of tons of dissolved clay and mud to migrate to the bottom of Dry Dock 2. The mud needs to be periodically removed from the Dry dock using cranes and caused thousands of man hours to be expended for mud removal.
2. <u>Dry Dock Pump Repair</u> – The Dry Dock 2 de-watering pumps have incurred significant costs related to repairs caused by the sinkholes. This was due to the heavy mud content of the water being pumped out of Dry Dock 2 since January 2015.

(Doc. 208-2, Pl. Ex. 2, Cowhey Rep. at 14.)

require professional expertise. He may, however, testify as to his personal knowledge about the condition of Dry Dock 2 and Rhoads's maintenance activities. Indeed, we are satisfied that Orbaugh's own observations and experience with the continuous operation of the pumps would fall squarely within the bounds of lay testimony permitted by Federal Rules of Evidence 602 and 701.[7] In fact, we previously addressed the propriety of Orbaugh's lay testimony in the context of reviewing Garbin's opinion in our *Daubert* decision:

> Garbin relied on the testimony of Rhoads' then-Director of Operations [Orbaugh], in which he "report[ed] a substantial increase in the amount of mud (silt) accumulating in [the dry dock] that began after the west side subsidence occurred, and that the water pumps used to keep [the dry dock] dry had to be switched from intermittent to continuous operation." Orbaugh testified that he was responsible for maintenance activities including "mud removal" and overseeing the soil piping system. He further testified that, as part of his job position, he was "on site every day," and that the amount of mud infiltrating the dry dock "increased considerably" following the pile driving activities. Clearly, the amount of soil piping and mud accumulation in the dry dock is within Orbaugh's "competency and personal knowledge," and it was permissible for Garbin to consider this testimony in combination with the other data he reviewed and his knowledge and experience.

(Doc. 150 at 17-18) (internal citations omitted).

Finally, we disagree with Defendants' position that "any" lay testimony would be "insufficient" to support these claimed damages. (Doc. 187 at 8.) We see no reason why Orbaugh's testimony, in conjunction with Garbin and Cowhey's, could not be considered by the jury in

---

[7] In filing this motion, Defendants assume that Orbaugh will offer, or that Plaintiff will solicit, improper lay testimony as to causation or damage calculations. This objection is premature. If Orbaugh attempts to testify to matters outside the scope of his personal knowledge at trial, we will then entertain an objection by Defendants on that basis. To the extent Plaintiff intends to introduce "additional trial witnesses with firsthand knowledge of the increase in debris and mud following Defendants' activities and the required pump repairs," lay testimony similar to that of Orbaugh's will likely be permitted so long as it stays within the parameters of Federal Rule of Evidence 701. (Doc. 202 at 6.) That said, we withhold any decision on the admissibility of testimony from these "additional trial witnesses" until they have been formally identified and presented to the Court.

15

determining the valuation of these losses. For these reasons, we are satisfied that there is sufficient evidence, in the form of both lay observation and expert opinion, to support Plaintiff's claim for damages related to the replacement or repair of the pump equipment. Defendants' motion is denied.

> **v. Preclude Lay Testimony Regarding Dry Dock Qualifications for Certifications and the Impact of Sinkholes on the Certification Process (Dkt. 15-921, Docs. 188, 203, 229)**

Next, Defendants seek to preclude any lay testimony regarding Plaintiff's "alleged inability to obtain certain dry dock certifications because of subsidence issues in the area of Dry Dock 2." (Doc. 188 at 6.) Specifically, Defendants note that Daniel Rhoads ("Mr. Rhoads") has offered past testimony about special certifications that were sought or required for certain projects and were ultimately not obtained. (*Id.*) Defendants claim that this lay testimony is the "predicate for [Plaintiff's] damages claim associated with the loss of use of Dry Dock 2 stemming from an alleged lack of certain certifications that required Rhoads to forgo unspecified dry dock projects." (*Id.* at 7.) We note that Mr. Rhoads previously attributed the lack of a Master Ship Repair Approval ("MSRA") certification to the subsidence issues around Dry Dock 2, which Cowhey then considered when calculating Plaintiff's damages. (*Id.*) Defendants contend that this testimony is improper, as Mr. Rhoads "has limited knowledge regarding the pre-requisites for an MSRA certification or any other certification standards in the dry-docking industry as it pertains to soil conditions or otherwise." (*Id.*) Defendants argue that, as Mr. Rhoads "lack[s] specialized knowledge based on personal experience in the dry-docking industry," he should not be permitted to testify to "Dry Dock 2's qualifications for certifications and the effect of sinkhole damage on Rhoads' ability to obtain certifications," without violating Federal Rule of Evidence 702.

Defendants raised this very issue at the summary judgment stage, claiming that, as a layperson, Mr. Rhoads' testimony as to Dry Dock 2's certification eligibility would be improperly speculative and therefore insufficient to support a claim for "loss of use" damages. (Dkt 15-921, Doc. 199 at 3.) In response to that argument, we held the following:

> [A]lthough we have determined that Rhoads's "loss of use" calculations require expert assessment, we do not accept that certain foundational information about Dry Dock 2's past and current certification eligibility, certification requirements in general, or customs and practices in the dry-docking business, also require expert testimony. As we explicitly stated in our *Daubert* decision precluding Defendants' proffered expert John Vitzthum ("Vitzthum"), Dry Dock 2's certification status does not require the "opinion" of an expert: "[I]t is not an 'opinion' whether the dry dock 'had any form of certification' since 1994. It either did have certifications or it did not." In precluding Vitzthum, we commented that much of the evidence as to Dry Dock 2's certification history, status, and eligibility could be introduced "with fact witnesses."

> We acknowledge that certain information about certifications or dry docking may be outside of the average juror's usual knowledge or realm of experience. We also note that lay witnesses may offer opinions on technical matters without qualifying as an expert under Rule 702. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995). ("[A] lay witness with first-hand knowledge can offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion."). Lay witnesses who are personally familiar with Dry Dock 2's certification history, who have personally carried out the certification process, or who have experience within the dry-docking industry, can sufficiently recount this information to a factfinder.[8] In short, we agree that Rhoads will be able to establish the appropriate background information for its "loss of use" damage with lay testimony by qualified personnel who are acquainted with the relevant facts.

> [8] Specifically, Defendants claim that any lay testimony by Rhoads's corporate representative, Daniel Rhoads, is "self-serving" and "based upon conjecture as opposed to the realities of bidding for government contracts within the dry-docking industry." On the contrary, it seems likely to us that Daniel Rhoads, the owner and CEO of Rhoads Industries, Inc., would be able to testify as to the

> "realities" of the dry-docking industry, considering that industry is
> the same one in which he operates his own business. Defendants
> may address any concerns that Daniel Rhoads's testimony may be
> "self-serving" on cross-examination at trial.

(Dkt. 15-921, Doc. 182 at 10-11, 11, n.8) (internal docket citations omitted).

We acknowledge, as Defendants point out, that our prior "denial of summary judgment" as to Plaintiff's "loss of use" damages claim was not a definitive ruling on the admissibility of any witness testimony on this issue. (Doc. 229 at 23.) Even so, we find that the reasoning from our summary judgment decision is instructive here. Fact witnesses who have personal experience in the dry-docking industry and the certification process, such as Mr. Rhoads, may offer lay testimony regarding Dry Dock 2's certification history, status, and eligibility in accordance with Federal Rules of Evidence 602 and 701. To the extent that Mr. Rhoads, or any other lay witness, attempts to testify at trial to matters that require professional expertise outside the scope of a layperson's understanding, we will entertain an objection to this testimony. For now, in accordance with our previous summary judgment opinion, we affirm that lay testimony regarding Dry Dock 2's past and current certification eligibility, certification requirements in general, or customs and practices in the dry-docking business, is admissible. Defendants' motion is denied.

### vi. Preclude Additional Evidence Related to the Alleged Assignment Between Plaintiffs and PAID (Dkt. 15-921, Docs. 189, 204, 216)

Defendants next seek to prohibit Plaintiffs from offering "any additional evidence not previously produced during discovery related to the alleged assignment between Plaintiffs and PAID." (Doc. 189-2 at 1). Defendants claim that the "only" evidence of an assignment offered by Plaintiff during discovery was: "(1) correspondence between counsel for Rhoads and PAID dated years after the alleged assignment was given; (2) the deposition testimony of Dan Rhoads; and (3) a declaration from a representative of PAID authored years after the alleged assignment." (*Id.* at

2.) Defendants correctly note that a party is required to produce all evidence that might be used to support its claims or defenses during discovery, and a failure to comply with this requirement precludes the use of that evidence at trial. *See* Fed. R. Civ. P. 26, 37.[8] Defendants assert that Plaintiff did not disclose any other information beyond the three items cited here to support Rhoads's alleged assignment with PAID. (Doc. 189-2 at 3-4.) Defendants request that "Plaintiff must be limited to only this evidence" and that we preclude Plaintiff from "offering any other documentary or testimonial evidence that was not previously produced prior to summary judgment," on the basis that "new or additional documents would be highly prejudicial and constitute unfair surprise to Defendants." (*Id*.)

To be sure, we do not disagree with Defendants that a party's failure to timely disclose or supplement evidence precludes the use of that evidence at trial, and we are prepared to issue the "automatic sanction" of preclusion when it is warranted. Fed. R. Civ. P. 37(c), Advisory Committee's Note to 1993 Amendment. We simply do not agree that such a sanction is justified here, where Defendants have failed to specify what evidence Plaintiff did not disclose during discovery or identify any improper or otherwise insufficient supplemental disclosures. Rather, they offer vague and conclusory allegations that Plaintiff produced "only" three pieces of evidence to prove the existence of its assignment with PAID, and that we should exclude "any other" evidence

---

[8] Federal Rule of Civil Procedure 26 reads in relevant part: "A party must, without awaiting a discovery request, provide to the other parties: all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment. A party […] must supplement or correct its disclosure or response […] if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(a),(e). Federal Rule of Civil Procedure 37 reads in relevant part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c).

that was not disclosed. (Doc. 189-2 at 3.) Defendants have not identified the "undisclosed" evidence to which they are referring. We are not inclined to levy sanctions against Plaintiff based on unspecified accusations, especially when we consider that Plaintiff vehemently contests these claims. Rhoads asserts that it "complied with its discovery obligations" and "disclosed the assignment between Rhoads and PAID during discovery." (Doc. 204 at 4.) Plaintiff directs our attention to evidence that it claims supports the existence of its assignment with PAID and was disclosed to Defendants during discovery.[9] (*Id*. at 2, n.2.) We cannot discern, nor have Defendants pointed us to, any factual basis for their assertion that Rhoads failed to disclose or supplement evidence during discovery, or that Rhoads possesses only "three" pieces of evidence that would prove its assignment with PAID. Defendants insist that they "are asking for a very simple *in limine* ruling: if the document did not exist and was not produced by [the close of discovery], it is inadmissible at trial." (Doc. 216 at 3.) We will enter this "simple" ruling only if it is warranted

---

[9] Regarding the "letter" and the "declaration" that Defendants previously identified, Plaintiff specifies them as follows: "The "letter" is the correspondence from Andrew Gowa (Rhoads) to Ilene Burak (PAID) dated May 29, 2019. […] The "declaration" is the sworn Declaration of Ilene S. Burak, Esquire, Senior Vice President & General Counsel of Philadelphia Industrial Development Corporation, dated October 21, 2021 […]." (Doc. 204 at 2, n.2.) Defendants also did not articulate any reason to preclude Plaintiff from offering Daniel Rhoads's deposition testimony at trial, where appropriate. (*Id*. at 5.) Furthermore, Plaintiff explains that: "Defendants do not refer to the other discovery Rhoads submitted in opposition to Defendants' Standing Motion: (a) deposition testimony by Robert Gorgone (corporate representative of PIDC/PAID) dated 12/11/19 (e.g., 88:21-24); (b) email from Robert Gorgone to the Navy dated 2/27/13; and (c) deposition testimony by John P. Leggette (corporate representative of PAID) dated 12/11/19 (e.g., 19:13-20:11)[.] Defendants also do not reference other discovery produced in this case, *e.g.*, 12/30/2016 letter from A. Gowa (Rhoads) to I. Burak (PAID) (RhoadsEast138804-05), relating to the assignment. It is unclear whether Defendants seek to preclude Rhoads from introducing all of this permissible evidence which was already produced in discovery." (*Id*.) Defendants have not raised any particularized objections as to this specific evidence in their motion.

upon our examination of Defendants' particularized claims.[10] For now, we will not issue a blanket ruling as to the admissibility of as-yet unspecified evidence.

Moreover, we cannot imagine why, as Defendants contend, Plaintiff would need to present evidence to prove its assignment with PAID at trial, as we have already determined that a valid assignment exists. Defendants argue that at the summary judgment stage, we apparently "did not hold that [an assignment] agreement [between Rhoads and PAID] exists" and that we "ruled that the alleged assignment remains a question of fact." (Doc. 189-2 at 2-3.) Accordingly, they assert that because we "did not affirmatively rule that Rhoads had met its burden of proof that it has a valid assignment from PAID[,]" Plaintiffs must prove the existence of the assignment at trial. (Doc. 216 at 2.) Defendants mischaracterize our previous holding. We concluded that Rhoads could

---

[10] We take issue with Defendants' request to exclude documents that "did not exist" by the close of discovery, especially when we consider that Rule 26 provides an exception for the disclosure of supplemental material that "has not otherwise been made known to the other parties during the discovery process[.]" Fed. R. Civ. P. 26(e). Rhoads admits that it seeks to introduce at least one piece of evidence that was disclosed beyond the discovery period: a letter from Andrew Gowa, a representative of Rhoads, to Ilene Burak, a representative of PAID, dated November 1, 2021. (Doc. 208-6, Ex. 6, Levin Opp. Dec.) The contents of the letter outline the terms of the assignment with PAID and reflect a confirmation of those terms by PAID on November 2, 2021. (*Id*.) Plaintiff acknowledges that this evidence was produced beyond the discovery period but reports that it provided Defendants with this document under its obligation to supplement per Rule 26(e). (Doc. 204 at 4-5.). Basic logic suggests that a letter written *after* the close of discovery could not possibly have been disclosed *during* discovery. Given that it was unable to provide this document before it was drafted on November 1, 2021, Plaintiff has represented that it otherwise provided this evidence to Defendants in a timely manner in accordance with the requirements set out by Rule 26(e). Facially, it appears that this information is "material" to the completeness of Plaintiff's previous disclosures regarding the assignment between PAID and Rhoads is therefore a proper supplement. Fed. R. Civ. P. 26(e). At present, we also cannot ascertain how Defendants could have been prejudiced by this late disclosure such that it would warrant the exclusion of the letter under Rule 37. Finally, we note that one of the "three" pieces of evidence Defendants seek to limit Plaintiff to using is the sworn declaration of Ilene Burak, PAID's representative, which was issued on October 21, 2021, after the close of discovery. By including this declaration in the "three" pieces of evidence that Defendants identified as being properly disclosed, Defendants appear to have conceded that this evidence is admissible, despite being produced after the discovery deadline.

survive a challenge of standing on summary judgment upon finding that, *as a matter of law*,

Rhoads and PAID executed a valid assignment:

> [T]he terms of Rhoads's lease agreement demonstrate that PAID, as the lessor, bears the costs of repairing and replacing the property. It follows that Rhoads has not suffered an "injury-in-fact" as to the damage to the property itself, as Rhoads is not responsible for those costs.
>
> We cannot, however, end our inquiry as to Rhoads's standing here. The next question is whether PAID assigned the right to seek repair costs for the damaged property to Rhoads. A legal assignment is "a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, chattel, or other thing." Consideration is not necessary to effect a valid assignment, the only legal requirement is that "the assignor must at the time of the assignment have a present intent to transfer or divest himself of his rights." As evidence of PAID's assignment, Rhoads points to a letter written and signed by a representative of PAID on May 29, 2019. The letter specifically states: "This [letter] will also confirm our agreement made shortly after the discovery of the 'sink-hole' or subsidence damage that PAID authorizes Rhoads to assert and prosecute the claims and litigation with respect to those damages." Defendants hotly contest the validity of this assignment, arguing that PAID did not exercise a "present intent" to transfer its right to sue, as the letter was signed approximately 4 years after Rhoads filed this litigation.
>
> In our view, Rhoads has clearly demonstrated that PAID divested itself of its right to seek repair costs for the property damage and then transferred that right to Rhoads. Rhoads has presented deposition testimony evidence from its own corporate representative, as well as statements by PAID's representative, which confirm that the parties made an informal agreement that assigned PAID's right to seek property damages to Rhoads.
>
> . . .
>
> Thus, it appears that the May 29, 2019 correspondence between Rhoads and PAID is merely a written memorialization of PAID's previously-exercised "present intent" to assign.[15]
>
> We accept that Rhoads received a valid assignment of PAID's right to pursue claims related to the damage of PAID's property. Thus,

we are satisfied that Rhoads has sufficiently set forth "specific facts" to demonstrate an "injury-in-fact," as is required to survive a challenge of standing on summary judgment. That is, Rhoads will incur the costs of repair or replacement to the leased premises and has thereby suffered a "palpable and distinct harm" as it relates to its interest in the property. Accordingly, summary judgment is denied as to this issue.

[15] Defendants claim that this oral assignment involved a transfer of an interest in property and is therefore subject to the Statute of Frauds. Under Pennsylvania law, the Statute of Frauds requires that "a lease of real property for a term of more than three years must be made in writing and signed by the parties." The assignment of a right to sue, however, is not a transfer of property. In any event, representatives for Rhoads and PAID have "admitted under oath that a contract was formed," and therefore satisfied an exception to the Statute of Frauds.

(Doc. 182 at 20-23, n.15) (internal citations omitted).

We acknowledge that "the standard for determining standing is not static," and that "elements of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Pennsylvania Prot. & Advoc., Inc. v. Houston*, 136 F. Supp. 2d 353, 360 (E.D. Pa. 2001) (citing *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). At the summary judgment stage, the plaintiff must "set forth by affidavit or other evidence specific facts" to demonstrate standing, and "at the final stage, those facts *(if controverted)* must be supported adequately by the evidence adduced at trial." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added) (internal citations and quotation marks omitted). Defendants are, of course, within their right to challenge Plaintiff's standing at trial, at which point Plaintiff will be subject to the appropriate standard of proof. But in light of our previous determination that PAID assigned its right to sue to Rhoads, we fail to see how Defendants could succeed on such a challenge. We remind Defendants of a basic legal principle we laid out in our summary judgment decision: "In

Pennsylvania, contract construction and interpretation are questions of *law* for the court to decide."
(Doc. 182 at 18) (quoting *Profit Wize Marketing v. Wiest*, 812 A.2d 1270, 1274 (Pa. Super. 2002)).
To be clear, our determination as to Rhoads's standing at the summary judgment stage was
predicated upon our *legal* finding that it executed a valid assignment with PAID. Despite
Defendants' assertion that it would not have been "appropriate" for us to enter "affirmative relief"
on this issue on summary judgment (Doc. 216 at 2), we rely on our neighboring district to explain
a court's role in this regard:

> Defendant's main contention, that the determination of whether the
> agreement constituted an assignment […] is a jury question, is not
> well founded in the law; particularly in light of defendant's
> admissions. […] [T]he general rule has been that the interpretation
> of a writing is for the court and such interpretation has largely been
> withdrawn from the jury. […] Defendant has conceded that there are
> no extrinsic facts or oral testimony that conflict with or place in issue
> any of the terms of the contract. What defendant disagrees with is
> the classification of the agreement[.] As pointed out above,
> however, under these circumstances the determination of whether
> the agreement is [an] assignment is purely a question of law to be
> determined by the court and is not a jury question. Admittedly, the
> court's determination is based upon facts, but these facts are clear
> and uncontested. […] The only question to be resolved in the instant
> case is a question of law to be determined from uncontested facts.

*Capital Blue Cross v. Paid Prescriptions, Inc.*, 496 F. Supp. 223, 225-27 (M.D. Pa. 1980) (internal
citations omitted.)

The circumstances present in *Capital Blue Cross* were identical to those before us on
summary judgment. We did not detect any genuine or material factual disputes as to the formation
of the assignment between Plaintiff and PAID. As we stated in our summary judgment decision,
Defendants "hotly contest[ed] the *validity* of this assignment," but the parties did not contest the
events underlying the execution of the agreement. (Doc. 182 at 21) (emphasis added). Indeed,
Defendants relied on various *legal* arguments challenging the legitimacy of the assignment,

maintaining that PAID's 2019 letter did not reflect a "present intent" to transfer its right to sue, and that any oral agreement between the parties was unenforceable under the Statute of Frauds. (*Id*. at 21-22.) As explained for the reasons recounted above, we rejected those arguments. (*Id*.) Accordingly, it was proper for us to decide "a question of law" from "uncontested facts." *Capital Blue Cross*, 496 F. Supp. at 227. The fact that Defendants disagree with our legal characterization of Plaintiff and PAID's agreement as an "assignment" is not reason enough to allow them to challenge that characterization before a jury at trial, and Defendants will be precluded from doing so. We do not dispute that Defendants may challenge Plaintiff's standing at trial, as it is a "jurisdictional requirement that can be raised at any time by any party, or by the court *sua sponte*." (Doc. 182 at 16) (citing *Blunt v. Lower Merion Sch. Dist*., 767 F.3d 247, 280 (3d Cir. 2014)). That said, we do not accept that any "facts" remain "controverted" such that Defendants could succeed on this issue at trial, as our finding that an assignment exists between Rhoads and PAID will not be extinguished.[11] *Lujan*, 504 U.S. at 561. For these reasons, Defendants' motion is denied.

---

[11] In opposition to Plaintiff's motion to "Preclude Evidence of the 2021 Navy Project and the October 28, 2021 Site Visit" (Doc. 193), which we discuss further below, Defendants argue that, "should the Court find that a valid assignment exists, then Rhoads stands in the shoes of the PAID/City and any work done and authorized by the City (i.e. the 2021 pile driving project) is now certainly admissible as against PAID/City of Philadelphia[.]" (Doc. 215-1 at 14.) Defendants fundamentally misunderstand the function of an assignment. An assignment is "a transfer of [a right] from one person to another, and unless in some way qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." *Emps. Ins. of Wausau v. Com., Dep't of Transp.*, 865 A.2d 825, 830 (Pa. 2005). In this case, we found that PAID transferred its lawful right to sue Defendants for property damage to Rhoads, which "extinguished" that particular right as to PAID. Although Plaintiff can now enforce this specific right on behalf of PAID, PAID has otherwise not been released from its burdens and obligations as the property owner, and Rhoads has not been substituted for PAID in connection with any of PAID's other responsibilities at the Philadelphia Naval Yard. The rights and benefits of a contract may be transferred by an *assignment*, but the obligations, burdens, and liabilities of a contract may only be transferred upon a *novation*. *Compare* Restatement (Second) of Contracts § 317 (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.") *with* Restatement (Second) of Contracts § 280

### vii. Limit Plaintiff's Damages Due to Plaintiff's Failure to Mitigate Damages (Dkt. 15-921, Docs. 190, 205, 217)

Defendants next request that we preclude Plaintiff's claim for "lost business damages" due to Plaintiff's alleged failure to mitigate its losses and allow Defendants to present evidence of Plaintiff's previous settlements in support of their mitigation defense. (Doc. 190-2 at 1.) According to Defendants, Plaintiff was obligated under Pennsylvania law to "minimize the harm stemming from the defendants' misconduct," which it apparently failed to do. (*Id*. at 4) (citing *Bartunek v. Koch*, 170 A.2d 563, 564-65 (Pa. 1961)). Defendants assert that they are not responsible for paying the cost of Rhoads's "avoidable consequences" in the form of lost profits, as "[t]he facts show that [Rhoads has] received large sums of money in settlement of [its] claims from [its] insurance carriers and the United States Navy, but [has] made no effort to use those funds, yet alone any funds, to repair the damage which [it claims] is allegedly causing an ongoing loss of business revenue." (*Id*. at 5.) Defendants seek to limit Plaintiff's recovery by presenting evidence of Plaintiff's alleged failure to utilize settlement funds for necessary repairs that would have mitigated its losses. (*Id*.) To that end, Defendants also assert that "[Plaintiff] must disclose the amounts [it] received in settlement" with its insurers and with the Navy, as those funds are "directly relevant" to Defendants' defense and would be "admissible at trial." (*Id*. at 3-4.) Defendants seek to compel disclosure of confidential settlement agreements, which Plaintiff has apparently "steadfastly refused" to provide. (*Id*. at 3.)

---

(1981) ("A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty."). Defendants apparently believe that our finding of an assignment as to a specific right means that Rhoads now "stands in the shoes" of PAID and is responsible for "any work done and authorized by the City." (Doc. 215-1 at 14.) This is not only a overstatement of our decision, but improperly conflates the concept of an assignment with a novation. To clarify, Rhoads "stands in the shoes" of PAID only for the purposes of bringing a claim for property damage against Defendants for injury incurred through 2019.

In considering Defendants' motion, we cannot ignore Federal Rule of Evidence 408, which generally prohibits the introduction of settlement agreements into evidence.[12] The rule is "motivated by strong public policy favoring the amicable resolution of disputes," and therefore "precludes the admission of settlement agreements when used to prove or disprove the validity or amount of a disputed claim." *Sikkelee v. Precision Airmotive Corp.*, 522 F. Supp. 3d 120, 143 (M.D. Pa. 2021) (internal quotation marks omitted) (quoting *Trout v. Milton S. Hershey Med. Ctr.*, 572 F. Supp. 2d 591, 600 (M.D. Pa. 2008)). Nevertheless, settlement evidence may be admissible "where offered for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." *Id*. at 144 (quoting Fed. R. Evid. 408). When determining the limited admissibility of this evidence, "[i]t is especially important to examine the policy goals underlying Rule 408." *Id*. In accordance with this policy, "federal courts frequently exclude evidence of settlements reached between a plaintiff and a former defendant or between a plaintiff and a non-defendant who is responsible for a portion of plaintiff's damages." *Trout*, 572 F. Supp. 2d at 599. Finally, we observe that the question of whether settlement evidence should be admitted for another purpose is "squarely

---

[12] Federal Rule of Evidence 408 reads: "(a) Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction: (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority. (b) The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408. This rule applies to settlements with third parties; former co-defendants and settlements with insurance companies. *See* 2 D. Louisell & B. Mueller, Federal Evidence § 171 at 289 (1978) ("The very terms of Rule 408 leave no doubt that […] a defendant cannot prove the invalidity or amount of a plaintiff's claim by proof of plaintiff's settlement with a *third person*, nor can plaintiff show the defendant's liability or extent of liability, by proof of defendant's settlement with a *third person*.")

within a district court's discretion," and that "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers." *Sikkelee*, 522 F. Supp. 3d at 144.

Defendants claim that evidence of Rhoads's previous settlements should be admitted for the limited purpose of demonstrating that Plaintiff had the financial capacity to minimize its damages, as Rhoads possessed the requisite funds to pay for repairs. (Doc. 190-2 at 5.) Without this information, Defendants assert that the jury would be "misled" and "presented with an incomplete and inaccurate understanding of the history of the alleged damages allegedly at issue." (Doc. 217 at 2.) In light of these arguments, we turn to *Young v. Allsteel Press Co.*, 539 F. Supp. 193 (E.D. Pa. 1982) for guidance. Like Defendants in this case, the defendant in *Young* also claimed that its express purpose in seeking to introduce evidence of the plaintiff's settlement with a former co-defendant was "not to prove the validity or invalidity of the claim or its amount," but rather to "minimize its potential exposure in damages." *Id*. at 194-95. The defendant argued that without evidence of the plaintiff's prior settlement, the jury would be "kept in the dark" and "misled into thinking that [defendant] was the only possible source of funds to compensate plaintiff for his injuries." *Id*. at 195. The court rejected the defendant's position, explaining that this evidence could not be admitted without violating the fundamental purpose of Rule 408:

> Taking [the defendant] at its word; i.e., that it wishes to prevent the jury from believing that [the defendant] would be the only source of a plaintiff's recovery, it is still not possible to see how this is not *precisely* the forbidden fruit excluded by operation of Rule 408. It is difficult to understand how [the defendant] is not, by its own admission, seeking to introduce such evidence to mitigate the amount of any possible jury award by informing the jurors that plaintiff has already received a measure of compensation for his injuries. Thus, upon more circumspect analysis it is clear that [the defendant's] argument is merely an attempt to circumvent the express prohibition of Rule 408.

*Id*.

We find that the reasoning employed by the court in *Young* is instructive here. The sought-after result of Defendants' request would almost certainly violate Rule 408.[13] Despite Defendants' insistence this information is necessary to their mitigation defense, we do not see how this justification could validly constitute "another purpose" under Rule 408 without implicating its ban on settlement evidence for "proving or disproving the validity or amount of the disputed claim." Fed. R. Evid. 408. Although we lack Third Circuit guidance on this question, other circuits have construed Rule 408(b) to exclude settlement evidence when it is offered for "limited purposes" that are "inseparable" from the prohibited purpose of "proving or disproving the validity or amount of the disputed claim." *See Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 224–25 (4th Cir. 2020) (explaining that a court must "consider whether a limited purpose is inseparable from one foreclosed under Rule 408(a)"); *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 966 (8th Cir. 2011) (a written agreement was not admissible to prove the defendant's "lack of good faith" because such a purpose "directly established" the defendant's liability for the plaintiff's bad faith claim); *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 798 (6th Cir. 2007) (evidence of a compromise offer was not admissible under Rule 408(b) to show a failure to mitigate damages because such a purpose "goes to the amount of the claim"); *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (evidence inadmissible to show compliance with the statute of frauds as purpose was "closely intertwined" with proving validity of the claim). In our view, admitting Rhoads's receipt of settlement funds from other parties for the limited purpose of minimizing Defendants' damages exposure is "inseparable" from the impermissible purpose of

---

[13] In opposition to this motion, Plaintiff also claims that the admission of its settlements would violate the collateral source rule under Pennsylvania law. (Doc. 205 at 4, n.2.) We address these arguments below. *See infra* Section III.B.iii.

proving or disproving the amount of Defendants' damages. Accordingly, this evidence is inadmissible under Rule 408.[14]

It follows that Defendants' secondary request, to compel the disclosure of Plaintiff's confidential settlement agreements, is also denied. Confidential settlement agreements may be disclosed only if the moving party can make a "particularized showing" that "the documents relating to the settlement negotiations are relevant and likely to lead to the discovery of admissible evidence." *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993). In order to meet the "particularized showing" standard, our court has required that, "[a]t minimum," a party must demonstrate that "the settlement agreement is likely to be admissible for a permitted purpose under Rule 408." *Spear v. Fenkell*, No. CIV.A. 13-02391, 2015 WL 3947559, at *2 (E.D. Pa. June 26, 2015); *see also Burlington v. News Corp.* ("*Burlington I*"), No. CIV.A. 09-1908, 2015 WL 2070063, at *3 (E.D. Pa. May 4, 2015) (refusing to compel the production of a confidential settlement agreement on the basis that the agreement was "relevant to issues concerning mitigation of damages"). As we have already explained for the reasons set out above, evidence of Plaintiff's confidential settlement agreements is not admissible for any purpose under Rule 408. Therefore, Defendants cannot meet the requisite standard to warrant the mandatory production of these

---

[14] We are also satisfied that this evidence is inadmissible under Rule 403. *See Trout*, 572 F. Supp. 2d at 599 ("Regardless of admissibility under Rule 408, the court may exclude [settlement agreements] if their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury [under Federal Rule of Evidence 403.]"). In our view, introducing evidence that Rhoads has received settlement funds from its insurer and from the Navy would have a "high risk" of confusing the jury and would prejudice Rhoads. *Sikkelee*, 522 F. Supp. 3d at 145. Especially when we consider that Defendants plan to present evidence of the Navy's culpability at trial and have sought to include them on the verdict sheet as a settled co-defendant, it is likely that a jury may infer that Rhoads settled with the Navy because the Navy was, in fact, liable. Accordingly, the jury may be inclined to reduce Defendants' liability, which would only "serve to punish" Rhoads for settling a portion of its claims. *Id.* This result would not only run afoul of the policy considerations underlying Rule 403, but also the purpose of Rule 408.

documents. Furthermore, we cannot ascertain how this disclosure could "lead to the discovery of admissible evidence," as the parties' discovery period has now passed. *Felicetti*, 148 F.R.D. at 534. This illuminates another problem with Defendants' request—it is untimely. As Plaintiff noted in its response briefing, fact discovery closed over two years ago.[15] Defendants did not seek information about Plaintiff's settlement agreements at the appropriate time, and we will not permit Defendants to now employ a motion *in limine* as a belated discovery device.[16]

---

[15] In a previous scheduling order, we stated: "All depositions […] and all remaining discovery shall be completed by April 30, 2020. Depositions shall be limited to those of witnesses presented by or formerly with the Navy." (Dkt. 15-921, Doc. 107.) We subsequently amended this order to extend certain deposition deadlines and expert discovery deadlines, but those later amendments did not affect our deadline for "all remaining discovery," which included documentary exchanges and related motion practice.

[16] Defendants cite to *Siegfried v. City of Easton*, 146 F.R.D. 98, 99 (E.D. Pa. 1992) for the proposition that a court may grant a discovery request beyond the discovery period. (Doc. 217 at 1.) We find the facts in *Siegfried* distinguishable from the circumstances presently before us. In that case, the plaintiffs previously made a request for the psychological records of a police officer "[d]uring the discovery phase," at which point defendants objected on the basis of privilege. *Id*. The plaintiffs then renewed their request for production of those same records before the court at the motion i*n limine* stage, via a "Motion in Limine in the Nature of Motion to Compel," which was granted, pending the court's review *in camera*. *Id*. From our review of the record, it appears that this motion *in limine* is the first time that Defendants have raised this particular discovery dispute. Defendants boldly state, without citation to any evidence to support their claim, that "[b]oth the Navy and American Home have advised Defendants that they had no objection to producing the settlement agreements/disclosing the settlement terms but could not do so without Plaintiff's approval." (Doc. 190-2 at 2-3.) Plaintiff denies that Defendants ever sought to obtain the settlement agreements during discovery. (Doc. 205 at 3) ("If Defendants believed they were entitled to these settlement agreements […] then they should have filed motions to compel before the close of fact discovery […]. They did not."). We will not grant a request for production that is both untimely and seeks the disclosure of evidence we have already deemed inadmissible. *See Droughn v. FMC Corp.*, 74 F.R.D. 639, 642 (E.D. Pa. 1977) (denying plaintiff's motion challenging defendant's discovery objections where "plaintiff waited until discovery was closed" to file the motion); *McCullough v. Dairy Queen, Inc.*, 195 F. Supp. 918, 919 (E.D. Pa. 1961) (denying motion for production of documents, even where request was relevant and properly limited in scope, because the motion was made beyond the discovery period "on the eve of trial"). Furthermore, Defendants claim that "there is nothing in the rules prohibiting a Motion *in Limine* in the form of a motion to compel." (*Id*.) While that may be true, Federal Rule of Civil Procedure 26(d) "make[s] clear and explicit the court's power to establish priority [of discovery deadlines] by an order[.]" Fed. R. Civ. P. 26, Advisory Committee's Note to 1970 Amendment. As stated

In sum, we will not preclude Plaintiff's claim for lost business damages, nor will we allow Defendants to present evidence at trial of Plaintiff's alleged failure to utilize settlement funds recouped in connection with this case. Defendants are also not entitled to the mandatory disclosure of Plaintiff's confidential settlement agreements at this late stage in the litigation. Our decision should not be interpreted as forestalling Defendants from pursuing any kind of mitigation defense at trial—they simply may not reference Plaintiff's receipt of settlement funds by its insurers or by the Navy in connection with this matter.[17] Furthermore, like the court in *Young*, we emphasize that "[n]othing prevents [the defendant] from introducing whatever probative evidence of [the former co-defendant's] culpability it may otherwise have offered with [the former co-defendant] present at trial." 539 F. Supp. at 198, n.18. As we stated at the summary judgment stage, Defendants will be permitted to present facts at trial to prove a *prime facie* case of negligence against the Navy,

---

above, we ordered that all remaining discovery (excluding certain depositions and expert-related discovery) was to be completed by April 30, 2020. (Doc. 107.) The last motion to compel in this case was resolved on April 15, 2020. (Doc. 108.) We cannot imagine why, over two years after that deadline expired, we are now faced with a motion to compel a documentary production.

[17] We remind Defendants that: "Mitigation of damages is an affirmative defense that the defendant bears the burden of proving. To prove a failure to mitigate, a defendant must show: (1) what reasonable [actions] the plaintiff ought to have taken; (2) that those actions would have reduced the damages; and (3) the amount by which the damages would have been reduced." *Deere & Co. v. Reinhold*, No. CIV. A. 99-CV-6313, 2000 WL 486607, at *8 (E.D. Pa. Apr. 24, 2000) (citing *Koppers Co., Inc. v. Aetna Cas. & Surety Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996)). "Whether a plaintiff has met the duty to mitigate damages is a question of fact, and therefore properly reserved for the jury where there is a genuine dispute of material over plaintiff's mitigation efforts." *Ngai v. Urban Outfitters, Inc.*, No. CV 19-1480, 2021 WL 1175155, at *20 (E.D. Pa. Mar. 29, 2021). Further, we acknowledge that Rhoads's settlement agreements *may* be relevant to the issue of a damages offset, but "to the extent the question of an offset of damages arises, it will not arise unless and until a jury returns a verdict in favor of Plaintiff." *Burlington I*, No. CIV.A. 09-1908, 2015 WL 2070063, at *4. "Even then, the settlement would not be evidence relevant to any issue in this case other than the ministerial apportionment of damages, a mathematical computation which the Court rather than the jury will perform." *Id.* (internal citation omitted). This issue is not presently before us, however, and we reserve the right to decide on this question should it arise post-trial.

which may warrant the Navy's inclusion on the verdict form. (Doc. 180 at 23). For the reasons stated above, Defendants' motion is denied.

> **viii. Limit Plaintiff's Damages to the Lesser of Cost of Repair and the Diminution to the Fair Market Value of the Property (Dkt. 15-921, Docs. 191, 206, 218)**

Defendants' penultimate motion *in limine* seeks to limit Plaintiffs' recovery for their alleged property damage claims to "the lesser of repair of the damaged property or the decrease in the fair market value of the property[.]" (Doc. 191-2 at 1.) At the outset, Defendants point to Pennsylvania law for the proposition that the value of property damage is determined according to "the cost of repairs where that injury is repairable; however, where the injury is characterized as permanent, the measure of damages becomes the decrease in the fair market value of the property. (*Id*. at 2) (quoting *Babich v. Pittsburgh & New England Trucking Co*., 563 A.2d 168, 170 (Pa. Super. 1989)). Defendants claim that the evidence in the record does not support a payment of repairs for a "brand-new dry dock […] [r]ather, Defendants are only responsible for restoring the property to its *former* condition[,]" which they claim was already in a dilapidated state when Rhoads began to occupy the property. (*Id*. at 6) (emphasis in original). Furthermore, Defendants request that we preclude any attempt by Plaintiff to introduce the damages theory that Dry Dock 2 is a "special purpose property," as "Rhoads has not set forth any evidence that the dry dock is 'special' in any way." (*Id*. at 9.)

Defendants seem to ignore the existence of our summary judgment decision on this issue and choose to reiterate arguments we have already rejected. Specifically, we concluded that the measure of Rhoads' alleged property damages should be presented to the jury for resolution:

> Defendants next argue that the appropriate measure of damage to Dry Dock 2 is "the cost of repairs or the decrease in the fair market

value of the property, whichever is lesser." In response, Rhoads contends that Dry Dock 2 qualifies as a "special purpose property" under Pennsylvania law and is thus entitled to the cost of "full repairs" to the dry dock, regardless of its fair market value. We accept that damages to real property are usually based on the "lesser of the cost of repair or the market value of the affected property." *Pa. Dep't. of Gen Servs. v. U.S. Mineral Prods. Co.*, 898 A.2d 590, 596 (Pa. 2006) (citing *Lobozzo v. Adam Eidemiller, Inc.*, 263 A.2d 432, 437 (Pa. 1970)). An exception to this general rule exists for "special use property," for which damages must be calculated based on "the complete cost of replacement." *Commonwealth Dep't. of Transp. v. Estate of Crea*, 483 A.2d 996, 1002 (Pa. Commw. Ct. 1977).

. . .

As both parties acknowledge, this exact issue was previously briefed for the Court two years ago, after Rhoads filed a motion requesting formal recognition of Dry Dock 2 as a "special purpose property." Following upon our review of the parties' arguments, we held that:

"We appreciate that the record is not complete and the parties are likely to produce expert reports that may be relevant to this question, but we must conclude that there are factual disputes integral to the "special use" determination, leaving us to conclude—at least at this stage—that this determination must be left to the jury."

. . .

The time for discovery is over, and Defendants now claim that the undisputed facts in the record support their position that Dry Dock 2 is *not* a special purpose property as a matter of law. We disagree. Having reviewed Defendants' current arguments in conjunction with our prior decision, it appears that the disputed facts we identified then remain in dispute now. Defendants fail to identify any fresh record evidence that resolves the factual conflicts previously highlighted. […] In short, lingering disputed facts in the record preclude the resolution of this issue as a matter of law.

The evidence in the record demonstrates that questions of fact remain as to Dry Dock 2's qualification as a "special purpose property." We are unconvinced that this question can be resolved as a matter of law. Defendants have not produced any new facts or new law since our prior decision that would allow us to dispose of this issue at this stage. Therefore, we reiterate our previous holding that

> this determination should be left to the jury. Accordingly, summary
> judgment is also denied as to this issue.

(Doc. 182 at 11-15) (emphasis in original) (internal docket citations omitted).

We are at a loss as to why this issue is before us again.[18] Defendants ask us once more to limit Plaintiff's damages to either the cost of repairs or the decrease in the fair market value of the property, and also to preclude Plaintiff's damages claim in its entirety, arguing that the evidence is insufficient to support Plaintiff's "special purpose property" theory. We will not grant a motion *in limine* based on contentions that we have already expressly dismissed.[19] For these reasons, and in accordance with our previous decisions on this issue, Defendants' motion is denied.

### ix.   Limit Plaintiff's Damages as to Alleged Loss of Navy Projects (Dkt. 15-921, Docs. 192, 207, 219)

Finally, Defendants seek to limit any evidence related to Plaintiff's claim that "due to the damages at the dry dock [Rhoads] lost bids or the ability to bid on Navy projects." (Doc. 192-2 at 2.) They allege that Plaintiff has offered "no evidence" to support the claim that Rhoads lost government bids "because of the dry dock damage." (*Id.* at 3.) In fact, according to Defendants,

---

[18] Before we considered this question during the summary judgment stage, it was first presented to the Court two years ago, at which point we also determined that it should be reserved for the jury. (Dkt. 15-921, Doc. 88).

[19] Rather than attempting to limit the evidence they expect Plaintiff to present in support of this claim at trial, Defendants instead renew their already-rejected argument that Plaintiff "lacks" evidence in support of this claim entirely. This strategic choice is especially confusing when we consider that Plaintiffs have presented ample evidence on this issue through three different experts. (Doc. 206 at 4.) In fact, Plaintiff claims that it is *Defendants* who have not adduced sufficient evidence to satisfy their fair market value damages theory, as "Defendants never disclosed an expert on market value." (*Id.* at 5.) Accordingly, Plaintiff asserts that Defendants have not satisfied their burden in proving an alternative damages theory. (*Id.*) Again, as we have stated, the jury will be presented with the available evidence and the parties' respective arguments on this issue, at which point they will determine how to measure Plaintiff's alleged property damage.

Plaintiff "can point to no specific project or contract that they lost as a result of the issues in this case" and "[t]here is no plausible basis on which to establish that Rhoads was unable to win certain bids, or how many bids Rhoads would have obtained but for the claimed damage to the Dry Dock and surrounding areas." (*Id*.) Defendants claim that the only witness Plaintiff has produced to address this claim is Mr. Rhoads, who apparently admitted that "he had no information as to the other bids or how the other bids were calculated" and that "the Navy never provided any explanation as to why Rhoads was not awarded the project." (*Id*. at 3-4.) Accordingly, Defendants seek to preclude Plaintiff's claim for damages on this basis, as any "speculative" evidence produced by Plaintiff has not established these damages with a "reasonable certainty" under Pennsylvania law.  (*Id*. at 4) (citing *Ware v. Rodale Press, Inc*., 322 F.3d 218, 226 (3d Cir. 2003)).[20]

Upon reviewing the available record, we simply disagree with Defendants' assertion that Plaintiff has offered "no evidence" in support of its claimed damages related to unsuccessful Navy project bids. First, we are not convinced that Mr. Rhoads's testimony is entirely inadmissible in support of these alleged losses. Although Mr. Rhoads may not be considered an expert on causation or damages, he is the owner and CEO of Rhoads Industries, Inc., and possesses the requisite personal knowledge under Federal Rules of Evidence 602 and 701 to testify as to the history of Plaintiff's bidding activities, including bids that were accepted or rejected by the Navy. Despite

---

[20] Defendants also cite to precedent from the Ninth Circuit, *Matson Plastering Co. v. Plasterers & Shophands Local No. 66*, 852 F.2d 1200 (9th Cir. 1988), for the proposition that, "courts that have considered the issue of lost profits resulting from the lost opportunity to bid on subsequent contracts have found proof of such damages too speculative and uncertain." *Id*. at 1203. We agree with Plaintiff that Defendants' reliance on this case is "misplaced," as *Matson* addressed the availability of lost profits under a specific provision of the Labor Management Relations Act, which is inapposite here. (Doc. 207 at 4.) Furthermore, as Plaintiff points out, the Ninth Circuit has clarified that lost profit damages are "necessarily an estimate" and can be awarded when "supported by substantial evidence." (*Id*.) (citing *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001)). In any event, we are not bound by Ninth Circuit precedent.

the fact that Mr. Rhoads is not privy to the Navy's reasons for denying Rhoads's bids, his testimony as to Rhoads's efforts in those bids is undoubtedly relevant and probative to determining Rhoads's alleged losses. Second, we emphasize that Mr. Rhoads's testimony is also buttressed by the professional calculations performed by Plaintiff's damages expert, Cowhey. In his report, Cowhey explained that he "independently researched industry trends, federal contracts, interviewed Rhoads' management and customers, and analyzed supporting records to identify historical commercial and government contracts from 2013 to 2019 which either Rhoads lost the bid, or did not submit a bid, due to the various limitations and higher operating costs cause by the sinkholes[.]" (Doc. 208-2, Pl. Ex. 2, Cowhey Rep. at 6). In particular, Cowhey identified "*specific actual projects* that Rhoads missed out on due to the sinkholes[,]" and calculated Rhoads' lost revenue in a section of his report entitled "Missed Potential Projects." (*Id*. at 8-9) (emphasis added). As we have explained, we approved Cowhey's methods and opinions as a financial expert under Federal Rule of Evidence 702 in our prior *Daubert* opinion.

In sum, it can hardly be said that Rhoads's damages claim against Defendants regarding Navy project losses should be precluded based on Rhoads's reliance on "speculative" evidence. We find that Mr. Rhoads and Cowhey's testimony is sufficient on this issue. To the extent that Defendants contest Cowhey's testimony, they may challenge him on cross-examination. Similarly, Defendants may highlight any purported deficiencies in Mr. Rhoads's testimony when he takes the stand at trial. The jury will assess the credibility of these witnesses and determine the appropriate weight to give their testimony in measuring Plaintiff's alleged lost profits as they pertain to Navy bids. For the above stated reasons, Defendants' motion is denied.

### B. Plaintiff's Motions *in Limine*

Plaintiff has submitted eight motions *in limine* for our consideration, seeking to preclude the following evidence: (1) "Evidence of the 2021 Navy Project and the October 28, 2021 Site Visit" (Dkt. 15-921, Doc. 193); (2) "Reference to the Opinions of John Vitzthum or Any Representative of DM Consulting" (Dkt. 15-921, Doc. 194); (3) "Evidence of Rhoads' Recovery of Insurance Proceeds from American Home Assurance Company or Hartford Fire Insurance Company" (Dkt. 15-921, Doc. 195); (4) "Any Reference to the Lawsuits filed by Plaintiffs Against the U.S. Navy and Settlement of Those Lawsuits" (Dkt. 15-921, Doc. 196,); (5) "Reference to the Appraisals of Rhoads' Property by Dunkin Real Estate Advisors" (Dkt. 15-921, Doc. 197); (6) "Arguments or Opinions that Plaintiffs Can Keep Any Verdict and Not Perform Any Repairs to the Property" (Dkt. 15-921, Doc. 198); (7) "Any Argument that Duffield Associates, Inc. and/or HDR Engineering, Inc. Should Be Included on the Verdict Sheet" (Dkt. 15-921, Doc. 199); and (8) "Take Judicial Notice of Three Government Documents." (Dkt. 15-921, Doc. 200.) After reviewing Plaintiff's arguments, all eight of its motions are granted, subject to any exceptions or conditions articulated below.

### i. Preclude Evidence of the 2021 Navy Project and the October 28, 2021 Site Visit (Dkt. 15-921, Docs. 193, 215, 221)

Plaintiff first asks us to preclude any evidence of, or reference to, the Navy's construction activities at the site in 2021 and the parties' joint site visit on October 28, 2021. (Doc. 193-2 at 2.) For context, Plaintiff contacted the Court and the parties on June 24, 2021, notifying them that the Navy had resumed pile driving activity near Rhoads's property in connection with a new construction project. (Doc. 201-1, Ex. 1, Rhoads Inc. Dec. at 2.) In its correspondence, Plaintiff indicated that despite its warnings to the Navy to cease pile driving, the Navy continued, and

Rhoads personnel subsequently noticed "an increase in water and sediment flowing from the floor of the dry dock." (*Id.*) On June 28, 2021, we held a telephone conference with counsel for the parties to discuss the impact of the Navy's construction project on this case and ordered them to submit briefs detailing their respective positions on "whether to reopen expert discovery related to the new pile driving." (Dkt. 15-921, Doc. 156 at 2.) On August 6, 2021, after reviewing the arguments presented in counsels' briefs and oral argument, declined to reopen expert discovery as to this issue. (*Id.*) Our decision notwithstanding, Plaintiff allowed Defendants to conduct a site visit with their experts on October 28, 2021.[21] Defendants subsequently submitted "supplemental" expert reports reflecting their observations from that visit.[22] Plaintiff now asserts that these reports, and any evidence pertaining to the above-stated events, should be inadmissible at trial as irrelevant, confusing, and prejudicial. (Doc. 193-2 at 7.)

In assessing Plaintiff's request to preclude this evidence, we start by reviewing particularly relevant excerpts from our prior decision, declining Defendants' request to reopen expert discovery for the purpose of investigating the impact of the Navy's new pile driving activity:

> Our concern with the Defendants' request to reopen is that we are unconvinced that the information sought is relevant or, even if it is, would be admissible under Fed.R.Evid. 403. We also conclude that the scope of the request is disproportionate to the needs of the case. […] [We] must take into account, here, the question of its relevance to the pile driving in 2013 and 2015. We accept that the information concerning this question was promptly brought to the attention of the Court and opposing counsel. We are unwilling, however, to characterize it as supported by good cause given the tenuous

---

[21] In addition to Defendants' October 28, 2021, site visit with their experts, the parties also conducted a joint "counsel-only" visit to the site on July 12, 2021.

[22] Plaintiff objected to these supplemental reports at the time they were submitted as a blatant violation of our decision not to reopen expert discovery for the purpose of investigating the impact of the Navy's new construction project. On November 16, 2021, we held an unrecorded telephone conference with counsel for both parties, during which expressed that we would withhold any ruling as to the admissibility of these reports until the motion *in limine* stage.

connection it may have to the 2013 and 2015 cases. We conclude that the information that Defendants now seek to obtain is outside the proper scope of discovery.

. . .

We note first that we need not be concerned about the relevance of this evidence as to damages in that Rhoads has expressly stated that it is cutting off its damage claims through December 2019. The parties dispute, however, whether the new information related to the new pile driving is relevant to the questions of causation and liability.

. . .

Whatever duty Rhoads may or may not have had in 2013 and 2015 either existed at that time or it did not. Rhoads' conduct in 2021 cannot retroactively create a duty to the Defendants in this litigation. Nor can Rhoads' recent conduct in 2021 alter its past conduct in 2013 and 2015 to retroactively create a breach of any duty that may or may not have existed. Accordingly, we conclude that evidence related to the new pile driving has no tendency to make any fact related to Rhoads' alleged comparative negligence more or less likely than it would be without the evidence. Fed.R.Evid. 401. Further, even if this evidence were relevant, we find that it presents a significant danger of "confusing the issues" and "misleading the jury." Fed.R.Evid. 403.

. . .

For the same reasons that we have determined Rhoads' recent conduct is not relevant, we are similarly not persuaded with regard to discovery that may be sought from the Navy. […]As we have already set out above with respect to Rhoads, whether the Navy was negligent in 2013 and 2015 is not affected by its conduct in 2021. Its most recent conduct cannot retroactively create any duty, nor can it retroactively impact whether the Navy breached any alleged duty. Any evidence related to the Navy's conduct in 2021 thus has no tendency to make it more or less probable that the Navy was negligent in 2013 or 2015, and it presents the danger of confusing the issues and misleading the jury.

. . .

Defendants represent that at the July 12, 2021 counsel-only site visit, they observed damage and evidence of ongoing subsidence, which

40

they believe is not related to the 2021 pile driving. They thus
contend that, if there is continuing damage at the dry dock which
was not caused by the 2021 pile driving, that circumstance would
bolster their argument that pile driving generally is not the cause of
damage at the dry dock, including the damage sustained in 2013 and
2015. We are unpersuaded by this argument. […] [W]e find that
whether the 2021 pile driving did or did not cause damage is too
attenuated to have any bearing on whether the 2013 and 2015 pile
driving caused damage.

. . .

For the reasons set out above, Defendants' request to reopen expert
discovery is denied[.]

(*Id*. at 3-8) (emphasis added).

We concede that our decision on this issue discussed whether this particular evidence was
discoverable, not whether it was admissible. Nonetheless, we find that our prior reasoning is
instructive in resolving the question before us. First, we reiterate that evidence of the Navy's
activity in 2021 could not possibly be relevant to damages at trial, as "Rhoads has expressly stated
that it is cutting off its damage claims through December 2019." (*Id*. at 4.); (Doc. 192-3 at 7)
("Rhoads is claiming economic damages through the end of 2019 only. Rhoads is also limiting its
claimed damage to the property to what occurred after each sinkhole.").[23] Next, we emphasize that

_____

[23] In opposition to Plaintiff's motion, Defendants raise many of the same arguments we considered
in denying their request to reopen expert discovery, *e.g.*, "This evidence supports Defendants'
contention that continued lack of maintenance, capital improvement, and upkeep are the cause of
the damages to this 102-year-old structure[.]" (Doc. 215-1 at 11.) These arguments are unavailing
for the same reasons we articulated almost a year ago. (Doc. 156 at 6.) One new argument that we
feel compelled to address is Defendants' assertion that on October 28, 2021, they "observed, over
7 years after Tritons' pile driving[,] at least 30 workers are using the building, which appeared to
be actively used as a workshop with tools and mechanical equipment, and with supplies being
stored there." (*Id*. at 12.) Defendants claim that "this is akin to seeing a plaintiff who claims they
cannot walk running a marathon a week before trial, then arguing that the defense cannot mention
it." *Id*. Rhoads disputes both the veracity of Defendants' observations and Defendants' implication
of bad faith. (Doc. 221 at 5.) We need not delve into the "truth" of what was observed on October
28, 2021, as Defendants' contentions ignore our finding that the condition of the property beyond
the period of Rhoads's claimed damages period, which ends in December 2019, is irrelevant. To

this evidence is not likely to be dispositive of any question pertaining to causation or liability at trial, "given the tenuous connection" it has to the events that gave rise to this lawsuit. (Doc. 156 at 3.) As we stated, matters that took place in 2021 cannot "retroactively" alter the parties' conduct in the years where Rhoads's claims originated. (*Id*. at 4-5.) Specifically, pile driving that occurred in 2021 is "too attenuated to have any bearing on whether the 2013 and 2015 pile driving caused damage." (*Id*. at 6.) We will not ascribe duties, breaches, and causes from the past to future events. Therefore, we maintain our previous position that evidence related to the Navy's new pile driving is not relevant under Federal Rule of Evidence 401, as it "has no tendency to make any fact related to Rhoads' alleged comparative negligence [or the Navy's alleged negligence] more or less likely[.]" (*Id*. at 5.) Even if this evidence were relevant, we reaffirm our finding that it "presents a significant danger of confusing the issues and misleading the jury" under Federal Rule of Evidence 403. (*Id*.) (internal quotation marks omitted).

Finally, we are satisfied that evidence we refused to deem *discoverable* is almost certainly not *admissible* at trial, especially when we consider that the standard for discoverability is broader than that of admissibility. *Cf. Neuberger & Scott v. Shapiro*, 196 F.R.D. 286, 287 (E.D. Pa. 2000) ("The discovery standard is less stringent [than the admissibility standard]—it requires only a reasonable likelihood that the discovered information will bring about the production of relevant evidence."). In accordance with our previous decision, and for the reasons stated above, we affirm that evidence pertaining to the Navy's 2021 construction project and the October 28, 2021 site visit, will be precluded entirely.[24] Plaintiff's motion is granted.

---

that same end, we will not consider Defendants' baseless accusation that Rhoads's damages claim is "fraudulent." (Doc. 215-1 at 13.)

[24] Our decision precludes the use of, or reference to, any documents, video, photographs, or testimony related to these events, *including* the "supplemental" expert reports submitted by

### ii. Preclude Reference to the Opinions of John Vitzthum or Any Representative of DM Consulting (Dkt. 15-921, Doc. 194)

Plaintiff next seeks to preclude Defendants from "referring to, referencing, or relying on in any way, [the] opinions of John Vitzthum [("Vitzthum")] and DM Consulting." (Doc. 194-2 at 3.) In making this request, Rhoads emphasizes that this Court previously precluded Vitzthum as an expert in our *Daubert* decision. (*Id.* at 4-5.) Specifically, we held that Defendants' failure to provide a timely and compliant expert disclosure had prejudiced Rhoads and therefore warranted Vitzthum's exclusion as a sanction. (Doc. 150 at 47-53.) We also explained that, notwithstanding Defendants' procedural errors, Vitzthum's testimony and opinions could not be considered "reliable" under Federal Rule of Evidence 702:

> Further, even if were not to exclude Vitzthum's testimony pursuant to Fed.R.Civ.P. 37(c) for failure to comply with Fed.R.Civ.P. 26(a),

---

Defendants in November 2021. Not only is this evidence irrelevant, prejudicial, and confusing, but we agree with Plaintiff that Defendants' "supplemental" expert reports were submitted in violation of our August 6, 2021 decision that precluded further expert discovery as to the Navy's renewed pile driving activity. Further, we are not convinced that Defendants' "supplemental" expert reports are proper. We acknowledge that litigants have an obligation to supplement expert reports and must do so "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *In re Asbestos Prod. Liab. Litig. (No. VI)*, 289 F.R.D. 424, 425 (E.D. Pa. 2013) (citing Fed. R. Civ. P. 26(e)(1)(A)). Even so, we believe that Defendants' November 2021 reports are not the kind of "supplements" contemplated by Rule 26. Notably, "Rule 26(e) is not an avenue to […] 'deepen' or 'strengthen' existing opinions." *Id.* (citing *Leviton Mfg. Co., Inc. v. Nicor, Inc.*, 245 F.R.D. 524, 528 (D.N.M. 2007)); *see also Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) (a supplemental expert report "seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report is beyond the scope of proper supplementation"). Further, "a supplemental report may be rejected where it […] was served merely because a party simply wished to supplement." *In re Asbestos*, 289 F.R.D. at 425. Here, Defendants submitted three, one-page "supplements," each of which merely stated that the opinions and findings from the prior experts reports "have not changed or been altered," "confirms my previously expressed opinion," or "remains unchanged," following the October 28, 2021 site visit. (Doc. 201-1, Exs. 8, 9, 10, Rhoads Inc. Dec.) Even if we found that these supplements were otherwise admissible under the Federal Rules of Evidence, we cannot accept that they are proper under Federal Rule of Civil Procedure 26, as they do not offer "material" opinions based on any "additional or corrective" information. Fed. R. Civ. P. 26(e).

we would nonetheless preclude it pursuant to [Fed.R.Evid.] 702 as unreliable. Indeed, while "[t]he standard for reliability is not that high," expert testimony must still be supported by "good grounds." Further, while the facts and assumptions underlying an expert's opinion are generally issues for cross examination and not preclusion, the opinions must still have at least "some factual basis," even if it is "shaky." Here, Vitzthum summarizes his opinion as follows: "It is my opinion, within a reasonable degree of professional certainty, that Rhoads' claim that it potentially lost government contracts and revenue from 2013 to present, when the dry dock has not had any form of certification since 1993, is unreasonable." There is no factual support in the record for the proposition that "the dry dock has not had any form of certification since 1993." To the contrary, Rhoads has provided certifications from 2012, 2015, 2017, and 2020. This contradiction with record evidence is not merely the sort of "conflicting evidence that is not a basis to exclude an expert's testimony." Rather, Vitzthum's inaccurate assertion that Rhoads' dry dock had no certifications after 1993 finds no support in the record, yet it is central to his conclusions. Under these circumstances, it cannot be said that Vitzthum's opinion has a sufficient factual basis to be reliable.

(*Id*. at 53-54, n.9) (internal citations omitted). We underscored Vitzthum's exclusion in our decision denying Defendants' request for reconsideration of Mr. Vitzthum's admissibility, and again in our decision denying Defendants' motion for summary judgment. (Dkt. 15-921, Doc. 158 at 10) ("[Defendants'] motion for reconsideration of our Order of July 2, 2021 precluding the testimony of John Vitzthum is denied."); (Doc. 150 at 10, n.7) ("We cannot, however, consider [Vitzthum's] report as we precluded Vitzthum from offering any such expert opinion for the reasons set out in two prior memorandum opinions."). In short, we have previously affirmed the preclusion of Vitzthum's testimony and opinion from trial of no less than three times.

Despite our prior decisions on this issue, Plaintiff explains that it filed this motion "[b]ased [on] Defendants' disregard of this Court's rulings on the inadmissibility of Mr. Vitzthum's 'report' and testimony [...] to pre-empt any attempt by Defendants to again disregard those rulings and refer to Mr. Vitzthum's 'report' or opinions during trial." (*Id*. at 3, n.2.) We note Defendants did

not avail themselves of the opportunity to file a response, therefore, Plaintiff's motion to exclude this evidence is unopposed. *See* E.D. Pa. Civ. R. 7.1(c) ("In the absence of timely response, the motion may be granted as uncontested[.]").[25] Even without the benefit of opposing argument, we are satisfied that there is no legal basis for allowing the testimony or opinions of Vitzthum or DM Consulting to be introduced at trial. Not only has this evidence already been precluded, but we agree with Plaintiff that any reference to Vitzthum would unfairly prejudice Rhoads and "mislead the jury" under Federal Rule of Evidence 403. (Doc. 194-2 at 5.) We reaffirm that any report or opinion by Vitzthum or DM Consulting will not be admissible at trial. For the above-stated reasons, and for the reasons set out in our previous decisions on this issue, Plaintiff's motion is granted.

### iii. Preclude Evidence of Rhoads' Recovery of Insurance Proceeds from American Home Assurance Company or Hartford Fire Insurance Company (Dkt. 15-921, Docs. 195, 211, 222)

Next, Plaintiff claims that insurance proceeds from its insurance companies, American Home Assurance Company ("AHAC") and Hartford Fire Insurance Company ("Hartford") should not be disclosed to the jury at trial.[26] (Doc. 195-2 at 3.) Rhoads invokes the collateral source rule, which "precludes references to other sources of recovery that are deemed irrelevant at trial, in

---

[25] Our Pretrial Scheduling Order, filed on April 5, 2022, required all motion *in limine* responses to be submitted "on or before June 10, 2022." (Dkt. 15-921, Doc. 186.) On June 2, 2022, Plaintiff's counsel requested an extension of this deadline on behalf of all parties, via email correspondence with the Court. We granted that request on that same day, also via email correspondence, and amended the deadline to file motion *in limine* responses to June 24, 2022. We note that Defendants timely submitted responses to six of Plaintiff's eight motions *in limine* by this deadline.

[26] Specifically, "AHAC provided property insurance to Rhoads for Building 669 while Hartford provided property damage coverage for Dry Dock 2 for associated business interruption losses." (Doc. 195-2 at 2.) Rhoads confirms that both companies paid certain amounts in accordance with its policies but emphasizes that those settlements were "confidential." (*Id.* at 3.)

order to avoid the possibility that an improper inference by jurors of a double recovery on the plaintiff's part might diminish due and proper damages which would otherwise be assessed against the tortfeasor." *Gallagher v. Pennsylvania Liquor Control Bd.*, 883 A.2d 550, 551 (Pa. 2005). The purpose of the collateral source rule is "to avoid precluding a claimant from obtaining redress from his or her injury merely because coverage for the injury was provided by some collateral source, *e.g. insurance.*" *Ocasio v. Ollson*, 596 F. Supp. 2d 890, 904 (E.D. Pa. 2009) (emphasis added). Although evidence of a plaintiff's recovery from collateral sources is generally inadmissible, "an exception exists if the evidence of such recovery is relevant to a *material issue* in the case." *Gallagher*, 883 A.2d at 557 (emphasis added). Plaintiff asserts that any recovery from AHAC and Hartford "has no relevance to Defendants' liability and the damages sustained as a result of Defendants' conduct" in connection with the collateral source rule, and that its admission would also "confuse and mislead the jury" under Federal Rule of Evidence 403. (Doc. 195-2 at 3.)

As discussed above, we have already determined that this evidence is inadmissible under Federal Rule of Evidence 408. *See supra* Section III.A.vii. Defendants raise the same arguments here that they raised previously, contending that evidence of Rhoads's receipt of insurance funds is relevant to Rhoads's claimed lost profit damages. (Doc. 211-2 at 3-5.) Specifically, they allege that Rhoads had a "duty to mitigate" its losses by utilizing the funds it received from AHAC and Hartford to carry out necessary repairs to the property. (*Id*.) In the context of the collateral source rule, specifically, Defendants argue that whether Rhoads could mitigate its lost profit damages is a "material issue" and that evidence of its insurance funds should be admissible for that limited purpose. (*Id*. at 5) (citing *Gallagher*, 883 A.2d at 557). Defendants rely on *Burlington v. News Corp.* ("*Burlington II*"), No. CIV.A. 09-1908, 2015 WL 3439149 (E.D. Pa. May 27, 2015) to argue that settlement payments can be relevant to a "material issue." (Doc. 222 at 4.) In *Burlington*, the

plaintiff sought "to exclude evidence that he received money—in the form of a settlement payment—from [the] defendants in a related lawsuit, in which he alleged damages that are nearly identical." *Id*. at *22. The court reasoned that, "in Title VII cases […] where the collateral source rule operates to exclude evidence, the types of collateral source damages that are deemed irrelevant include unemployment compensation, Social Security payments, and welfare programs." *Id*. Accordingly, the court held that the collateral source rule did not preclude the admissibility of a settlement from a separate, prior, and factually related, lawsuit. *Id*.

We are not persuaded that *Burlington* is instructive in these circumstances. First, the court in *Burlington* analyzed the admissibility of this evidence in the context of Title VII, which is not at issue. Second, the settlement in *Burlington* arose out of a previous lawsuit, rather than the same lawsuit, as is the case here. Finally, the court in *Burlington* expressly stated that the collateral source rule excludes evidence of proceeds received from "insurance." *Id*. This is exactly the kind of evidence that Rhoads seeks to preclude. Despite Defendants' assertion that this evidence would be offered only in support of their mitigation defense, this purpose would likely serve to "diminish the damages" that Plaintiff might recover from Defendants and therefore undermine the protection offered by the collateral source rule. *Ocasio*, 596 F.Supp.2d at 904. We also agree with Plaintiff that the admission of this evidence would violate Rule 403, as it is likely that a jury would become confused or misled about the value of Plaintiff's damages or the validity of Plaintiff's claims at trial if they were informed that Plaintiff had already recovered money from a different source. This information could only serve to prejudice Rhoads at trial, as a jury may be inclined to improperly reduce Defendants' potential liability. Accordingly, any evidence of Rhoads's settlements with its insurers, AHAC and Hartford, will be precluded.

Although we will not allow Defendants to affirmatively admit evidence of Plaintiff's insurance *proceeds* at trial, we will allow Defendants to admit evidence of Plaintiff's insurance *coverage* in the narrowest of circumstances. Defendants anticipate that "Dan Rhoads will testify at trial that Plaintiffs did not have enough money to make repairs." (Doc. 217 at 2.) This court recently addressed this very issue in *Williams v. Benshetrit*, No. 19-CV-00797, 2022 WL 138007 (E.D. Pa. Jan. 14, 2022), in the context of a dental malpractice claim:

> If Plaintiff testifies at trial that he was unable to afford dental care, Defendant can introduce Plaintiff's admissions during his depositions, both that he had dental insurance and what his dental insurance covered, to impeach his credibility about his lack of funds to pay for dental work. […] Plaintiff's assertion of his ability to afford dental treatment is [material] [sic] to the issue of liability. If Plaintiff opens the door on this issue, the fact that he had dental insurance is appropriate evidence on cross-examination, but the extent of this evidence may be limited.

*Id.* at *4. We will hold the same as the court in *Williams*. In the event that Rhoads "opens the door" as to the affordability of repairs, Defendants may inquire on cross-examination as to the fact that Rhoads had insurance to cover its losses and what, specifically, the insurance covered. *Id.* As in *Williams*, we reserve the right to limit the "extent" of this evidence; Defendants should be advised that this ruling does not vitiate our previous decision as to the admissibility of settlement evidence under Rule 408 and that we are not likely to admit any evidence about Rhoads's settlements with AHAC and Hartford. *See supra* Section III.A.vii. For the above stated reasons, Plaintiff's motion is granted, subject to the exception discussed herein.

iv. **Preclude Any Reference to the Lawsuits filed by Plaintiffs Against the U.S. Navy and Settlement of Those Lawsuits (Dkt. 15-921, Docs. 196, 209, 223)**

Plaintiff also requests that we preclude Defendants from making any reference to the lawsuits filed against the Navy and the settlement of those lawsuits. (Doc. 196-2 at 3.) In filing this motion, Rhoads acknowledges that, in accordance with our previous summary judgment decision, Defendants will be permitted to present evidence of the Navy's liability at trial for purposes of apportionment under the Pennsylvania Fair Share Act ("Fair Share Act").[27] (*Id.*) (citing Doc. 180 at 23.) Rhoads emphasizes that "[g]ranting this Motion will not prevent Defendants from arguing that the jury should determine if the Navy should be apportioned some percentage of negligence […] [i]t simply restricts the evidence that can permissibly be presented in support of such an argument." (*Id*. at 4, n.1). To that end, Rhoads insists that Defendants do not have "carte blanche" to introduce evidence of the "the lawsuits filed by Rhoads against the Navy

---

[27] Specifically, we held:

> Defendants have presented facts from which a jury could reasonably conclude that the Navy failed to take appropriate precautions against damage caused by vibrations from Defendants' pile driving. That said, we remind Defendants that setting forth enough evidence to withstand a challenge on summary judgment does not mean that the Navy's negligence has been conclusively established. In order to warrant apportionment of liability under the Fair Share Act, Defendants must present facts at trial to support a prima facie case of negligence against the Navy It may very well be that, considering all the evidence offered at trial, the record might not support a negligence claim against the Navy. At this stage, it remains undecided as to whether the Navy should appear as a settled codefendant on the verdict form.

(Doc. 150 at 22-23.) For further discussion regarding the specific provision of the Fair Share Act that Defendants seek to invoke at trial, *see infra* Section III.B.vii.

(including specific allegations made against the Navy in those complaints […]) and the settlement of those suits." (*Id* at 3.) Plaintiff asserts that the admission of evidence regarding its lawsuit and settlement with the Navy is irrelevant, prejudicial, and a blatant violation of Rule 408.

As we have already explained, evidence of Plaintiff's confidential settlement agreement with the Navy is not admissible for any purpose under Rule 408. *See supra* Section III.A.vii. We need not address these arguments again. Our determination as to the inadmissibility of settlement evidence aside, we agree with Plaintiff that any evidence of Rhoads's previous lawsuit against the Navy, including pre-discovery allegations and now-settled claims, is irrelevant and prejudicial under Rules 401, 402, and 403. Specifically, the pleadings in which Rhoads originally articulated its factual allegations and legal claims against the Navy have little to no dispositive value and are not "evidence" of the Navy's liability. *See Foster v. Berwind Corp.*, No. CIV. A. 90-0857, 1991 WL 83090, at *1 (E.D. Pa. May 14, 1991) ("The allegations, however, in the complaints in these other actions are just that: allegations. To begin examining and admitting evidence of accusations […] at other possible culprits […] are dispositive of nothing and would confuse the complex issues already present."). Further, presenting evidence of the settled claims against the Navy together with the surviving claims against Defendants would not only distract the jury, but also unreasonably burden them with the task of disentangling the claims. *See Kimes v. Univ. of Scranton*, No. 3:14-CV-00091, 2016 WL 1274134, at *2 (M.D. Pa. Apr. 1, 2016) (excluding evidence of previously dismissed claims "out of concern for a lay jury's inability to compartmentalize dismissed and surviving claims" and "because the dismissed claims are irrelevant to the jury's disposition of the surviving claims"). Finally, Rhoads will likely be prejudiced by evidence of its previous lawsuit against the Navy, as it would "signal to the jury that the Navy is not in court because it has settled with Rhoads," which could "induce the jury to decide

this case on improper grounds (*e.g.*, the mistaken belief that Rhoads was already compensated for its damages with the Navy)." (Doc. 223 at 2.)

Defendants contend that "[t]he placement of the Navy on the verdict sheet is [...] contingent on evidence being adduced at trial to establish that the Navy's negligence contributed to the damage allegedly caused by vibrations from Defendants' pile driving." (Doc. 209 at 6.) To be sure, we do not disagree that Defendants must assemble and present evidence of the Navy's negligence at trial to warrant apportionment under the Fair Share Act. We merely emphasize that the Rhoads's previous lawsuit and settlement with the Navy are not "evidence" of the Navy's liability. Defendants' assert that "[t]he theories of liability against the Navy *are set forth in Rhoads' lawsuit*" and that they "must rely on and reference the allegations in the lawsuits filed against the Navy to prove the theories of liability asserted against the Navy." (*Id*. at 6-7) (emphasis in original). We will not preclude Defendants from adopting Rhoads's theories of liability against the Navy, in acknowledgement of the fact that a defendant must necessarily "step into the shoes" of the plaintiff to present evidence of a former co-defendant's negligence at trial. (Doc. 180 at 23) ("In order to warrant apportionment of liability under the Fair Share Act, Defendants must present facts at trial to support a *prima facie* case of negligence against the Navy."). That said, we *will* preclude Defendants from referencing Rhoads's lawsuit against the Navy or in any way informing the jury that their theory of liability against the Navy originated with Rhoads.

Finally, Defendants argue that Plaintiff's request is "premature," and that we would be better informed as to the prejudicial effect of this evidence and the issuance of an appropriate limiting instruction when viewed in light of the trial record. (Doc. 209 at 10.) We disagree and remind Defendants that "the Federal Rules of Evidence provide a district court with broad discretion to exclude collateral matters that are likely to confuse the issues." *Kant v. Seton Hall*

*Univ.*, 279 F. App'x 152, 157 (3d Cir. 2008) (quoting *United States v. Casoni*, 950 F.2d 893, 919 (3d Cir. 1991)) (internal quotation marks omitted). It does not stretch the imagination to comprehend the prejudice that would ensue if we admitted evidence of either Rhoads's lawsuit or settlement with the Navy, and we are satisfied that even the most comprehensive limiting instruction could not cure its effect. We do concede, however, that if Defendants present facts in support of the Navy's liability at trial, the jury may wonder why the Navy is absent from the defense table. To that end, balancing the interests of both parties, we will instruct the jury at the outset of the case and before it is charged that it should not speculate as to why the Navy is not at trial.[28] *See Sikkelee*, 522 F. Supp. 3d at 146. Notwithstanding this sole, narrow instruction, Plaintiff's motion is granted.

### v. Preclude Reference to the Appraisals of Rhoads' Property by Dunkin Real Estate Advisors (Dkt. 15-921, Docs. 197, 212, 224)

Plaintiff also seeks to preclude Defendants from referring to, or relying on in any way, the appraisals of Rhoads's property by Dunkin Real Estate Advisors ("Dunkin") in presenting its counter-theory of damages.[29] (Doc. 197-2 at 2.) For context, Plaintiff explains that "Dunkin was

---

[28] In the event that we determine sufficient evidence has been adduced at the close of trial to warrant the Navy's inclusion on verdict form, we will modify our instruction appropriately.

[29] Plaintiffs are correct that, in challenging its proffered damages theory, *Defendants* have the burden of proving its fair market value damages *counter-theory*. We are guided by the case law that Plaintiff has identified:

> [I]n Pennsylvania, the measure of damages is the cost of repair not to exceed the fair market value of the property at the time of loss. [...] Although there are no Pennsylvania cases on this point, common sense would dictate that it is defendant's burden to challenge plaintiff's damages. Placing that burden on the plaintiff would seriously undermine the adversarial nature of our trial system. We approvingly quote the following: "Where there are two possible measures of damages and plaintiff adopts one of them, it is

retained by or on behalf of lenders as part of Small Business Administration financing" to appraise the value of Rhoads's leasehold interest in the property. (*Id*. at 4) (citing Doc. 168-1, Rhoads Dec. ¶ 15). The appraisals, which were issued in 2013 and 2016, "*themselves* state that they are not appraisals of the fair market value of the real property[,]" and "were not prepared for, on behalf of, or at the direction of Rhoads." (*Id*. at 3-4) (emphasis added). Rhoads filed this motion in anticipation that Defendants will attempt to use the Dunkin appraisals at trial to prove their fair market value theory of damages. (*Id*.) As a procedural matter, Plaintiff asserts that this theory requires expert testimony, and that "Defendants have not disclosed Dunkin as an expert witness or presented its appraisals as expert opinions" as required by Federal Rule of Civil Procedure 26, and that we should exclude this evidence pursuant to the automatic sanction of preclusion set out in Federal Rule of Civil Procedure 37. (*Id*. at 4-6.) Plaintiff also claims that it would be prejudiced by the admission of this evidence, as Rhoads did not have the opportunity to depose Dunkin or file a *Daubert* challenge. (*Id*. at 7.) Moreover, Plaintiff insists that this evidence is irrelevant, as Dunkin appraised the fair market value of Rhoads's *leasehold interest* in the property for lender purposes, not the fair market value of the property itself. (*Id*.)

As Plaintiff pointed out, when we previously considered the parties' arguments as to the measure of special use damages versus the measure of fair market value damages, we explained

---

incumbent on defendant to show that the other measure would be less expensive to him."

*Moyer v. White*, 48 Pa. D&C 3d 487, 503 (1988) (quoting 25A C.J.S. § 144(e) at 22). Here, Rhoads has presented evidence of the cost of repair and replacement of the property. Accordingly, the burden has shifted to Defendants to present evidence of the fair market value of the property. *See Watsontown Brick Co. v. Hercules Powder Co*., 265 F. Supp. 268, 275 (M.D. Pa. 1967), *aff'd*, 387 F.2d 99 (3d Cir. 1967) ("[W]here plaintiff also introduces evidence of the cost of repairs to the property the burden shifts to defendant to establish matters asserted by him in mitigation or reduction of the amount of damages.").

that expert reports would be necessary to this question. (Doc. 150 at 4.) Defendants, too, conceded at that time that "whether a dry dock has an ascertainable market value requires expert testimony because such an analysis is outside of the average juror's normal realm of experience." (Doc. 77 at 7, n.1) (citing *Young v. Commonwealth of Pa. Dep't. of Transp.*, 744 A.2d 1276, 1278 (Pa. 2000)). The time for expert discovery has passed, without any indication by Defendants that they intended to affirmatively employ Dunkin's findings in support of their fair market value damages theory. Defendants do not deny that they failed to designate Dunkin as an expert, however, they assert that Rhoads cannot be prejudiced by the inclusion of this evidence at trial, as it was "produced [by Rhoads] during ordinary fact discovery between the parties" and that "Plaintiffs had every opportunity to depose Dunkin." (Doc. 212-2 at 4.) We remind Defendants of the standard for exclusion under Rule 37, which we set out in our prior *Daubert* decision:

> [Rule 37] provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." […] As discussed above, the Third Circuit has set out five factors that trial courts may consider in determining whether exclusion of evidence or a witness is appropriate: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence." We are further mindful that "[t]he importance of the evidence is often the most significant factor," and that "[t]he non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless."

(Doc. 150 at 48-49) (citing *ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254, 298 (3d. Cir. 2012)).

In applying these factors below, we conclude that preclusion of the Dunkin material is appropriate.

First, we find that Rhoads has been prejudiced by Defendants' failure to provide a timely expert disclosure. Although Rhoads itself produced the Dunkin appraisals during fact discovery, and therefore could not have been "surprised" by the contents of the appraisals, Defendants have nonetheless deprived Rhoads of the opportunity to prepare a *Daubert* motion due to their failure to designate Dunkin as an expert. Defendants claim that Rhoads could have deposed Dunkin at any time, but Rhoads had no obligation to initiate the deposition of an expert witness that it was not using in support of own case and that was otherwise unidentified by Defendants. The mere fact that Rhoads produced documents authored by Dunkin during discovery did not give rise to an affirmative duty on Rhoads to depose Dunkin. Further, the parties are unable to cure this prejudice, as the appropriate deadlines have expired: Defendants' expert disclosures "regarding damages" were due on September 15, 2020; expert discovery closed on January 15, 2021; the parties' *Daubert* challenges were resolved on July 2, 2021. (Docs. 119, 127, 150.) The time for disclosures has elapsed and a trial date has been set; we will not allow Defendants to "disrupt the orderly and efficient" litigation process by passing off documentary evidence it received in discovery as expert opinion. *See Mente Chevrolet Oldsmobile Inc. v. GMAC*, 728 F. Supp. 2d 662, 679 (E.D. Pa. 2010), *aff'd*, 451 F. App'x 214 (3d Cir. 2011) (excluding expert testimony revealed two weeks before trial). Finally, Defendants fail to offer any reason for their non-compliance with these deadlines, instead attributing the fault to Rhoads.

In reviewing Defendants' briefing on this issue, we feel an overwhelming sense of déjà vu. At the *Daubert* stage, Defendants made these exact same arguments in defense of their failure to timely disclose another expert, Vitzthum. Accordingly, we are prepared to dismiss Defendants' arguments now as to Dunkin in the same manner as we did then as to Vitzthum:

> [W]e are not persuaded that [Rhoads's] decision not to depose
> Vitzthum weighs against Rhoads. Indeed, Defendants have an

affirmative obligation to provide compliant expert disclosures. To the contrary, Rhoads has no affirmative obligation to depose Defendants' witnesses, and it is certainly has no obligation to utilize its depositions as a substitute for Defendants' compliant disclosures or to remedy Defendants' failure to provide them. Rather, as Rhoads asserts, the only way to cure this prejudice at this stage would be to reopen expert discovery, which has been closed for over five months, require Defendants to provide a compliant expert disclosure, permit Rhoads to depose Vitzthum and to submit a new *Daubert* motion. However, Defendants have not so much as requested the opportunity to pursue any cure, and instead rest only on their attempt to direct blame at Rhoads' decision not to depose Vitzthum. We are therefore unwilling to pursue the cumbersome, costly, and time-consuming cure that would be necessary at stage, particularly considering the circumstance that Defendants have not even requested it.

. . .

Defendants' apathetic response to Rhoads' concerns regarding their expert disclosures raises legitimate questions with respect to whether there was "any bad faith or willfulness" in failing to comply. That is, Defendants did not offer any reason whatsoever, let alone any "substantial justification," for their failure to timely provide a compliant expert disclosure. Rather, they merely attempt to argue that their failure was harmless by shifting the blame to Rhoads for opting not to depose Vitzthum.

(Doc. 150 at 50-51.)

Having rejected these arguments, we turn to "the most significant factor," in our analysis: the importance of the evidence to be excluded. *ZF Meritor*, 696 F.3d at 298. Despite Plaintiff's insistence that the Dunkin appraisals address the value of Rhoads's leasehold interest only, Defendants point out that Dunkin calculated the fair market value of the property, unencumbered by Rhoads's lease, at between $5,400,000.00 and $5,600,000.00. (Doc. 201-17 at 44); (Doc. 201-18 at 40.) Even so, we note that the express purpose of the appraisals was to "develop an opinion of the *'as is' market value* of the **leasehold interest** of the subject property." (Doc. 201-18 at 3) (emphasis in original.) The fact that the appraisals include the estimated fair market value of the

56

property is of little import when we consider that this estimate was devised only for the purpose

of calculating the value of Rhoads's lease—not for calculating the value of the property itself.

Indeed, Dunkin specifically instructs that the document "shall be considered only in its entirety"

and that "[n]o part of this appraisal report shall be utilized separately or out of context." (Doc. 201-

18 at 59.) The appraisals themselves also caution that they were made subject to certain "general

assumptions" and "limiting conditions" about the underlying property.[30] (*Id*.) We will not permit

Defendants to cherry-pick information from the Dunkin reports to support their fair market value

damages theory. Given that the value of Rhoads's leasehold is not at issue in this case, we are

persuaded that this evidence is insignificant. In light of the foregoing analysis, we find that the five

factors set out by the Third Circuit weight in favor of excluding the Dunkin reports to the extent

they are offered as independent expert reports.[31]

  That said, we must address Defendants' argument that their experts Wes Grover ("Grover")

and James Schofield ("Schofield") should be allowed to reference and rely on the appraisals at

trial, as they did in their reports. (Doc. 212-2 at 6.) They contend that the appraisals are admissible

under Federal Rule of Evidence 703 as "facts or data" on which their experts have been "made

---

[30] Specifically, Dunkin made the following assumptions about the subject property: "title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions," "the property is under responsible ownership and competent management," "there are no encroachments, zoning violations or restrictions," "the property is in compliance with all applicable building, life-safety, environmental, zoning, and other federal, state and local laws, regulations and codes," "there are no hidden or unapparent conditions in the structural components, foundation, HVAC, plumbing, electric systems, subsoil, etc. which would render the property more or less valuable," "there is no [presence of presence of asbestos, urea-formaldehyde foam insulation, or other hazardous materials] that would cause a loss in value." (Doc. 201-18 at 59-61.)

[31] Plaintiff also claims that "because Defendants have no expert testimony on market value of Rhoads's property, Defendants should be precluded from arguing that Rhoads's damages are in any way limited by market value." (Doc. 197-2 at 4.) As we have stated before, "the jury will be presented with the available evidence and the parties' respective arguments on this issue, at which point they will determine how to measure Plaintiff's alleged property damage." *Supra* note 19.

aware of or personally observed." (*Id.*); *see also* Fed. R. Evid. 703.[32] Although the Federal Rules of Evidence "do not permit experts to simply 'parrot' the ideas of other experts or individuals, experts are permitted to rely on materials used by other experts in developing their own opinions." *I.B.E.W. Loc. Union 380 Pension Fund v. Buck Consultants*, No. CIV. A. 03-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008) (internal citations omitted). That is, "experts may use a mix of objective data and subjective analysis from another expert to create an admissible report, and an expert's knowledge of specific facts regarding the incident—or lack thereof—goes to the weight accorded to that expert's report and testimony, rather than its admissibility." *Id.* (internal citations and quotation marks omitted). There is no dispute that Plaintiff disclosed the Dunkin appraisals during the course of discovery, and that Plaintiff was aware that Grover and Schofield relied on those appraisals in forming their opinions. Accordingly, Defendants assert that their experts "should be permitted to testify about their reliance on the Dunkin appraisal report at trial." (*Id.*)

At the *Daubert* stage, we approved of the qualifications, reliability, and "fit" of both Schofield and Grover, after reviewing the data on which they based their opinions. We explained that Schofield was retained "to opine on the age, maintenance, and repair of the dry dock," and that he concluded "that the condition of the dry dock was consistent with its age and that it had suffered from a lack of maintenance since the 1970s." (Doc. 150 at 54.) We found that "Schofield's testimony will assist the jury in understanding the evidence as it relates to Rhoads' damages

---

[32] Federal Rule of Evidence 703 reads as follows: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

claims" and concluded that he was an admissible expert. (*Id*. at 59-60.) Similarly, Grover was retained "to assist in the evaluation of the financial claims by Rhoads." (*Id*. at 60.) As a damages rebuttal expert, Grover concluded that "five categories of damages calculations Rhoads' experts provided—Lost Income, Extra Expenses, Future Extra Expenses, Dry Dock 2 and Crane Repair Costs, and Building 669 Repair and Replacement Costs—are 'overstated,' 'speculative,' and/or 'unsupported' and therefore 'should not be relied upon.'" (*Id*.) Ultimately, we found that "Grover's testimony will assist the jury in evaluating the complexities of Rhoads' experts' damages calculations" and concluded that he, too, was an admissible expert. (*Id*. at 64.)

Despite Plaintiff's protests, we do not disagree with Defendants that the Dunkin appraisals may be admissible in this limited context. Grover utilized the Dunkin appraisals in his evaluation of Building 669's condition, noting that, "[f]rom the appraiser's assessment, it appears that the building has not been well maintained[.]" (Doc. 227-1, Levin Dec., Ex. 1 at 35.)  Plaintiff contests Grover's opinions, claiming that Grover "incorrectly" recounts information about Building 669 from the reports, and that "he does not use the appraisal for fair market value," nor does he "include a single damage calculation in his report." (Doc. 224 at 7.) As to Schofield, Plaintiff claims that he "simply lists" the appraisals as documents that he "reviewed," but also does include any damage calculation or property valuation. (*Id*. at 8) (citing Doc. 227-2, Levin Dec., Ex. 2 at 9.) The extent of Grover and Schofield's reliance on the Dunkin appraisals affects the weight of their expert testimony, but it is not a basis to render their testimony, or the appraisals, inadmissible. We already acknowledged at the *Daubert* stage that Grover's report "does not contain any independent damages calculations or otherwise provide any alternative damages figures to contradict those of Rhoads' experts." (Doc. 150 at 61.) We acknowledge the same here as to Schofield's report. Neither Grover nor Schofield will not be permitted to introduce damages calculations or offer any

conclusions as to the fair market value of the property, as those opinions were not included in the scope of their original reports.[33] To the extent that Grover or Schofield relied on the Dunkin appraisal in arriving at the opinions that were presented and approved by this Court at the *Daubert* stage, that testimony will be permitted.

To summarize, the Dunkin appraisals may not be offered as affirmative expert opinions as to the fair market value of the property, due to Defendants' failure to comply with the expert disclosure requirements of Rule 26. We will, however, allow Defendants' experts Grover and Schofield to testify about portions of the Dunkin appraisals upon which they previously relied. For the above stated reasons, Plaintiff's motion is granted, subject to the exception discussed herein.

### vi. Preclude Defendants from Presenting Arguments or Opinions that Plaintiffs Can Keep Any Verdict and Not Perform Any Repairs to the Property (Dkt. 15-921, Docs. 198, 213, 225)

Plaintiff next seeks to prevent Defendants from presenting any argument that Plaintiff could keep the verdict as to its property damage claim and not perform any repairs to the property. (Doc. 198-2 at 4.) In filing this motion, Plaintiff turns our attention to Defendants' previous motion for summary judgment, in which they argued that "there is nothing in the record indicating that Rhoads has any legal obligation to make any repairs to the Leased Premises[,]" therefore, "Rhoads could obtain a recovery [for property damage] and never repair the property[.]" (Dkt. 15-921, Doc. 162-2 at 12.) Accordingly, Defendants asserted that "City/PAID would be left with unrestored property and their own legal right to pursue any and all claims for damages to said property." (*Id.*

---

[33] We clarify that our determination here does not necessarily foreclose the possibility that Grover and Schofield could be permitted to offer rebuttal testimony on this subject in the event that Plaintiff's experts' testimony opens the door to it, pursuant to Federal Rule of Evidence 703. *See Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006). We reserve any rulings on this narrow point until the appropriate circumstances at trial.

at 12-13.) In anticipation that Defendants will raise these same arguments at trial, Plaintiff seeks to preclude this issue at trial on several bases. First, Plaintiff contends that Defendants' position is inconsistent with our prior finding that a valid assignment exists between PAID and Rhoads, in which we concluded that Rhoads "will incur the costs of repair or replacement to the leased premises[.]" (Doc. 198-2 at 4) (citing Doc. 182 at 22). Furthermore, Plaintiff insists that this argument is "contrary to the record evidence," as it has produced correspondence between Rhoads and PAID that memorializes "the understanding between the parties and confirming in writing Rhoads's obligation to use the net proceeds from this litigation to repair the property." (*Id*. at 4-5) (citing Doc. 201-20, Ex. 20, Rhoads Dec). Finally, Plaintiff claims that any argument by Defendants can "keep the money and run without making the repairs" would prejudice Rhoads, create confusion, and mislead the jury "into concluding that Rhoads should not be compensated for the damage because it will not make the repairs." (*Id*. at 4.)

In response, Defendants insist that we "did not affirmatively find that a valid assignment exists" at the summary judgment stage, and that Rhoads's obligations as to the property remain a "question of fact" for the jury. (Doc. 213-2 at 3.) Therefore, this motion is "premature," and Defendants should be "entitled to argue that Plaintiffs have no legal obligation under the alleged assignment to repair the Property consistent with the evidence, including the terms of the lease, presented at trial." (*Id*.) As we explained above, Defendants misunderstand the effect of our summary judgment decision. *See supra* Section III.A.vi. At that stage, we made a legal finding based on uncontested facts that PAID executed a valid assignment with Rhoads, divesting itself of its right to pursue claims for property damage and transferring that right to Rhoads. (Doc. 182 at 20-23) ("We accept that Rhoads received a valid assignment of PAID's right to pursue claims related to the damage of PAID's property."). Accordingly, any argument by Defendants that

Rhoads can pocket the proceeds of its property damage claim and PAID could later bring its own claim against Defendants would conflict with our determination that Rhoads and PAID forged a binding assignment on this issue. As Plaintiff points out, Defendants' argument is also unsupported by the documents exchanged between PAID and Rhoads, which set out the terms of Rhoads's legal obligation to make necessary repairs to the leased property. Having reviewed the available record evidence in conjunction with our prior decision as to Rhoads and PAID's assignment, we are satisfied that there is no basis for Defendants' arguments at trial. Even if we agreed that these arguments were relevant to any fact or claim at trial, they are inadmissible under Rule 403, as they would likely prejudice Rhoads, create confusion, and mislead the jury. For these reasons, Plaintiff's motion is granted.

### vii. Preclude Defendants from Presenting Any Argument that Duffield Associates, Inc. and/or HDR Engineering, Inc. Should Be Included on the Verdict Sheet (Dkt. 15-921, Doc. 199)

Plaintiff also seeks to preclude Defendants from presenting any argument that Duffield Associates, Inc. ("Duffield") or HDR Engineering, Inc. ("HDR") should be included on the verdict sheet.[34] (Doc. 199-2 at 2.) For context, Plaintiff explains that Duffield was retained by Defendant Shoreline for "primary construction review, reviewing pile installation and sheet pile installation." (*Id*. at 2) (internal citations omitted). Similarly, HDR was retained by Defendant Triton to design "the demolition plans for the pier[,]" which included the use of piles. (*Id*. at 5) (internal citations omitted). Plaintiff notes that Duffield and HDR are not, and never were, parties to this litigation.

---

[34] Plaintiff also argues that "in the alternative, [Defendants should be precluded] from arguing Defendants are not vicariously liable (or have *respondeat superior* liability) for the actions of Duffield and HDR." (Doc. 199-2 at 2.) Given that Defendants have not opposed Plaintiff's request on this point, we agree that Defendants are not permitted to argue that they are not vicariously liable via *respondeat superior* for the actions of Duffield or HDR as their employed subcontractors.

(*Id*. at 4-5.) Citing the original pleadings in this matter, Plaintiff emphasizes that neither Shoreline nor Triton ever named Duffield or HDR in their respective responses to the Complaint, or otherwise indicated that they should be considered legally responsible actors in this litigation. (*Id*.) Although Defendants have not made any affirmative indication that they plan to apportion responsibility to Duffield or HDR, Rhoads explains that it nonetheless filed this motion in anticipation that "Defendants will attempt to argue that Duffield and/or HDR should be included on the verdict sheet in order to reduce their liability exposure" under the Fair Share Act. (*Id*. at 6).

As we set out in our earlier summary judgment decision, the Fair Share Act "expands the scope of persons to be submitted to the factfinder for apportionment of liability by allowing the allocation of responsibility to a settled nonparty." (Doc. 180 at 5) (citing *Timmonds v. AGCO Corp*., No. 2916 EDA 2019, 2021 WL 1251868, at *38 (Pa. Super. April 12, 2021)) (internal quotation marks omitted). This exception specifically applies to "any defendant or other person *who has entered into a release with the plaintiff with respect to the action and who is not a party*[.]" 42 PA. CONS. STAT. § 7102, *et seq*. (2011) (emphasis added); *see also Roverano v. John Crane, Inc.*, 226 A.3d 526, 547 (Pa. 2020) ("From its text, Section 7102(a.2) contemplates apportioning liability to two entities: (1) defendants; or (2) any non-party "who has entered into a release with the plaintiff with respect to the action."). As Plaintiff correctly points out, neither Duffield nor HDR are or were defendants in this action, nor have they "entered into a release" with Rhoads in reference to this litigation. (Doc. 199-2 at 5-6.) We agree with Plaintiff that the plain language of the Fair Share Act would preclude the inclusion of Duffield and HDR on the verdict form.

Notably, Plaintiff's motion to exclude these arguments is unopposed, as Defendants did not avail themselves of the opportunity to file a response. *See* E.D. Pa. Civ. R. 7.1(c) ("In the absence of timely response, the motion may be granted as uncontested[.]") We consider

Defendants to have conceded Plaintiff's arguments on this basis. Even without the benefit of any opposition by Defendants, we are nonetheless convinced there is no legal justification for any argument that Duffield or HDR should be included on the verdict sheet under the Fair Share Act. For these reasons, Plaintiff's motion is granted.

###### viii.   Take Judicial Notice of Three Government Documents (Dkt. 15-921, Docs. 200, 210, 226)

Finally, Plaintiff asks us to take judicial notice of three government documents that are relevant to Rhoads's claimed damages regarding its inability to obtain certifications and contracts with entities such as the U.S. Navy. (Doc. 200-2 at 3.) The first document is the Department of Defense Standard Practice—Safety Certification Program For Drydocking Facilities and Shipbuilding Ways For U.S. Navy Ships—MIL-STD-1625D(SH) ("Document 1"). (*Id*.) Document 1 outlines the "standard approved for use by the Naval Sea Systems Command, Department of the Navy, and is available for use by all Departments and Agencies of the Department of Defense." (*Id*. at 4.) The document can be accessed on "www.everyspec.com, a website that provides access to over 55,000 Military, DoD, Federal, NASA, DOE, and Government specifications, standards, handbooks, and publications." (*Id*.) The second document is Department of the Navy, Naval Sea Systems Command, NAVSEA Instruction 4280.2C ("Document 2"). (*Id*. at 3.) Document 2 was issued by the U.S. Navy "[t]o revise policy, guidelines, and procedures governing the issuance of the Master Ship Repair Agreement (MSRA) and the Agreement for Boat Repair (ABR) to firms meeting the eligibility requirements prescribed in enclosures (1) Master Ship Repair Agreement (MSRA) Eligibility Requirements and (2) Agreement for Boat Repair (ABR) Eligibility Requirements respectively." (*Id*. at 4.) The third and final document is DFARS Regulation for Master Agreement for Repair and Alteration of Vessels, Subpart 217.71

("Document 3"). (*Id.*) Document 3 "contains acquisition policies and procedures for MSRAs, including contract clauses" and is accessible on the government's website. (*Id.*)

Plaintiff cites to Federal Rule of Evidence 201, which sets out the court's authority to take judicial notice of "adjudicative facts" in the following circumstances: "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Plaintiff also points out that "The court *must* take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2) (emphasis added). Here, Plaintiff asserts that all three documents are "official government documents displaying the Department of Defense seal" and were issued either by the Department of Defense or the Department of the Navy.  (Doc. 200-2 at 5.) Plaintiff points us to several examples of courts taking judicial notice of government documents. *See Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1, 97 n. 40 (2008) (concluding it is "appropriate" to take judicial notice of FAS 109 because "Federal Accounting Standards Board, the organization responsible for FAS 109, is a transparent, reliable professional organization and the court has no cause to question the accuracy of the financial accounting standards posted on the organization's website"); *White v. SSA*, 111 F. Supp. 3d 1041, 1047-48 (N.D. Cal. 2015) (taking judicial notice of Social Security Administration (SSA) policy documents accessible on SSA website and noting decision does not preclude party from presenting evidence that policies changed, were not followed, or conflict with other policies); *Brown v. Fed. Express Corp.*, 62 F. Supp. 3d 681, 687 (W.D. Tenn. 2014) (taking judicial notice of "standards and procedures propagated by the CDC"). Accordingly, Plaintiff believes judicial notice is warranted, as the facts contained in the documents are "not subject to reasonable dispute," mainly due to the

fact that the government sources of these documents are "reputable and cannot be reasonably questioned." (*Id*. at 6.)

Defendants claim that this motion is "premature" and that we should deny Plaintiff's motion due to the fact that "[t]he Government documents total approximately 165 pages, and no discrete 'facts' have been identified." (Doc. 210 at 6.) Defendants claim that there "is no basis to know how Rhoads will seek to use these Government documents at trial and which, if any, will be relevant or otherwise admissible as evidence at trial to prove damages." (*Id*.) To this end, Defendants also note that "it is error to judicially notice a fact which may be the subject of some dispute in litigation." (*Id*.) (citing *LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC.,* 287 F.3d 279, 290 (3d Cir. 2002)). We are not persuaded by Defendants' arguments. First, these documents set out the standards that govern the industry certifications and government contracts at issue in this case. They are likely to help the jury determine if Rhoads's claimed lost profits damages are "more or less probable," and will likely be facts "of consequence." Fed. R. Evid. 401. Further, the length of the documents and the volume of facts contained within are not significant factors in our assessment of whether to take judicial notice of this evidence. Our focus is whether the information in the three documents "is not subject to reasonable dispute," as it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Defendants claim that it is "disputable" that the documents will "support Rhoads's damages claim." (Doc. 210 at 4.) Defendants misapprehend the standard set out by Rule 201 and conflate the parties' subjectively disputed claims with the documents' objectively undisputable facts. We are aware that Rhoads's claimed damages and the manner in which they seek to prove them is disputed by Defendants. This dispute has no bearing on whether the facts contained in Documents 1, 2, and 3 are accurate and authentic. At this time, Defendants have not

articulated any argument that the information contained in the identified government documents "can be reasonably questioned." Having been supplied with the necessary information by Plaintiff, we will take judicial notice of Documents 1, 2, and 3.[35] Plaintiff's motion is granted.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motions are denied, and Plaintiff's motions are granted, subject to the exceptions and conditions articulated above. An appropriate Order follows.

---

[35] In opposition to Defendants' motion to "Preclude Lay Testimony Regarding Dry Dock Qualifications for Certifications and the Impact of Sinkholes on the Certification Process" (Doc. 188), Plaintiff asserted that if we took judicial notice of these three government documents, then it would likely not need to introduce Mr. Rhoads's or other lay witness testimony on "applicable standards and necessary certifications for Navy ship repair work." (Doc. 203 at 3.) Seeing as we have taken judicial notice of these three documents here, and that we allowed lay testimony on this issue as outlined above, *see supra* Section III.A.v., Plaintiffs may utilize either or both kinds of evidence at trial.